IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* JOEY EDWARD M. ROQUE, M.D., | ) ) ) | **FILED UNDER SEAL** PURSUANT TO THE FALSE CLAIMS ACT |
| Plaintiff/Relator, | ) ) | 31 U.S.C. § 3729, *et seq.* |
| v. | ) ) | Civ. No.: _____ Judge: _____ |
| ENCOMPASS HEALTH CORPORATION, MYRTLE BEACH REHABILITATION HOSPITAL, LLC d/b/a TIDELANDS HEALTH REHABILITATION HOSPITAL, affiliate of ENCOMPASS HEALTH CORPORATION, LISA S. TARBERT-SMALDONE, M.D., | ) ) ) ) ) ) ) | **JURY TRIAL DEMAND** |
| Defendants. | ) | |

---

## COMPLAINT

---

On behalf of the United States, the Plaintiff/Relator, JOEY EDWARD M. ROQUE, M.D., by and through his attorneys, files this *qui tam* action against the Defendants pursuant to the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, and alleges as follows:

# TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................................. 3

II.    NATURE OF THE ACTION ................................................................................. 4

III.   JURISDICTION AND VENUE .......................................................................... 5

IV.    THE PARTIES ...................................................................................................... 5

    A.   THE RELATOR ....................................................................................................... 5
    B.   THE DEFENDANTS .................................................................................................. 7

V.     SOURCE OF RELATOR'S ALLEGATIONS AND RELATOR'S PRE-FILING
      DISCLOSURE ....................................................................................................... 15

VI.    LEGAL FRAMEWORK ..................................................................................... 16

    A.   THE FEDERAL FALSE CLAIMS ACT ..................................................................... 16
    B.   THE MEDICARE PROGRAM .................................................................................. 17
    C.   THE MEDICARE REIMBURSEMENT FRAMEWORK FOR IRFS ................................ 20

VII.   NARRATIVE OF PARTICULARS ................................................................. 25

    A.   FALSELY ADMITTING AND RETAINING PATIENTS WHO DO NOT QUALIFY FOR IRF .......... 25
    B.   FALSIFYING PATIENT ASSESSMENT INSTRUMENT FORMS: ARTIFICIALLY DECREASED
        AT ADMISSION AND INCREASED AT DISCHARGE ................................................ 43
    C.   FALSIFYING PATIENTS' LENGTHS OF STAY & DELIBERATELY EXTENDING DISCHARGE .... 45
    D.   FALSE RE-ADMISSIONS OR "SECOND CHANCE" ADMISSIONS ............................ 48
    E.   INAPPROPRIATE AND UNNECESSARY CONSULTATIONS DURING IRF ................. 49
    F.   MOTIVE TO ENGAGE IN THE FRAUDULENT CONDUCT: QUOTAS AND CASH BONUSES ....... 55
    G.   CORPORATE TRAINING ....................................................................................... 57
    H.   UTILIZING NON-REHABILITATION PHYSICIANS IN THE FRAUD .......................... 61
    I.   ADDITIONAL REPRESENTATIVE FALSE CLAIMS SUBMITTED TO GOVERNMENT PAYORS .... 63
    J.   WRONGFUL TERMINATIONS & RETALIATION AGAINST EMPLOYEES ................. 65
    K.   RELATOR'S PRIOR DISCLOSURES TO THE GOVERNMENT .................................... 67

VIII.  SPECIFIC COUNTS AND RELIEF SOUGHT ............................................. 68

IX.    PRAYER FOR RELIEF ..................................................................................... 71

## I.     INTRODUCTION

1.      This is a *qui tam* action filed by Relator Joey Roque, MD (hereinafter "Relator" or "Dr. Roque") on behalf of the United States of America (hereinafter "United States") against Defendants, Encompass Health Corporation (hereinafter "Encompass Health"), Myrtle Beach Rehabilitation Hospital, LLC d/b/a Tidelands Health Rehabilitation Hospital, affiliate of Encompass Health Corporation (hereinafter "Tidelands Health"), and Lisa S. Tarbert-Smaldone, M.D., for using, making, presenting, and causing to make, use, or present false statements and claims to the government, and conspiring to commit such violations, in violation of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.* (hereinafter "FCA").

2.      The fraud alleged herein is straightforward:  Defendants illegally, intentionally, and for financial gain have defrauded government healthcare programs, such as Medicare and other government-funded healthcare programs (collectively hereinafter "Government Payors")[1] by submitting and/or causing to submit false rehabilitation and therapy claims for reimbursement.

3.      Defendants are the largest owner and operator of inpatient rehabilitation hospitals in terms of patients, number of hospitals, and with net operating revenue for its inpatient rehabilitation division in excess of $3,496,000,000 for FY 2020.

4.      Defendants' inpatient rehabilitation facilities ("IRF") are supposed to provide patients with therapy and rehabilitative services, and treatment by a multi-disciplinary team of physicians, therapists, and nurses.

5.      Defendants instruct and train their employees to engage in a number of fraudulent schemes in the operation of its IRFs with the sole goal of generating and increasing profits at the

---

[1] At all times stated herein, the term "Government Payors" also includes other government healthcare programs, including TRICARE/CHAMPUS 10 U.S.C. § 1071, *et seq.*, since said programs have similar requirements and have been similarly defrauded by Defendants, as alleged herein.

grave expense of patients and taxpayers, including, but not limited to, falsely admitting and retaining patients who do not qualify for IRF therapy with false and/or upcoded diagnoses, including by re-classifying patients to a CMS-13 compliant diagnosis in order to justify IRF admission and also meet the sixty percent (60%) compliance threshold required by Government Payors for IRFs; falsifying patient assessments in the Government Payor forms by artificially decreasing scores at admission and increasing scores at discharge; falsely extending patients' lengths of stay and deliberately refusing to discharge patients as appropriate; falsely re-admitting patients for IRF therapy, known as "second chance" admissions, for the same or similar diagnosis that justified the previous IRF admission; billing for unnecessary "consultations" during the patients' IRF stays to increase the overall reimbursement, and these claims are thereafter fraudulently submitted to Government Payors, primarily Medicare, for reimbursement.

6.     Defendants train and motivate its employees to engage in the fraud through various means, including requiring quotas, paying cash bonuses, through corporate training, utilizing physicians to cooperate in the fraud, particularly non-Physiatrists, and then by retaliating against those employees who object and/or refuse to participate in the fraudulent schemes.

7.     As a result of the fraudulent conduct since at least 2019 through the date of this filing, the Defendants wrongfully receive millions of dollars per year from Government Payors.

## II.     NATURE OF THE ACTION

8.     This is an action to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733.

9.     Under the False Claims Act, a person may bring an action in Federal District Court for himself and for the United States, and may share in any recovery. 31 U.S.C. § 3730(b). That person is known as a "Relator" and the action that the Relator brings is called a *qui tam* action.

## III.    JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction to adjudicate this action under 28 U.S.C. §§ 1331 and 1345.

11.    This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact and have transacted business in this District and maintain an office in this District.

12.    Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and Defendants transacted business and maintained an office in this District.

## IV.    THE PARTIES

### A.    **<u>The Relator</u>**

13.    Relator, Dr. Joey Edward M. Roque, M.D., brings this action on behalf of the United States, including its agency, the Department of Health and Human Services ("HHS"), its component, the Centers for Medicare & Medicaid Services ("CMS"), and all other government healthcare programs, including Amerigroup, TRICARE/CHAMPUS, Blue Cross/Blue Shield – CHIP, and Veterans Administration ("VA"). (All federal healthcare agencies and programs are referred to collectively as "Government Payors" and "Medicare" respectively, unless otherwise specified).

14.    Relator is a licensed medical doctor specializing in Physical Medicine and Rehabilitation, also known as Physiatry. Relator (NPI No. 1396847448) is a Diplomate, American Board of Physical Medicine and Rehabilitation (Certificate No. 6452); member of the American Academy of Physical Medicine and Rehabilitation; licensed with the South Carolina Board of Medical Examiners (License No. 81712); licensed with the Tennessee Board of Medical

Examiners since 2012 (License No. 41492); licensed with the Illinois Dept. of Professional Regulation from 2003 to 2008; licensed with the North Carolina Medical Board from 1999 to 2001; and licensed with the Professional Regulation Commission, Philippines, since 1993.

15.    Relator originally began working for the Defendants' Central and Memphis-North facilities on August 13, 2018, as a locums physician in Memphis, Tennessee. The Relator was then contracted as an independent contractor by Defendants from May 10, 2019, to May 11, 2020 thereafter working as the Associate Medical Director during most of his tenure over one of Defendants' IRF locations in South Carolina.

16.    After months of Relator continually refusing to engage in the fraudulent conduct, as hereinafter alleged, Relator's job duties as Associate Medical Director began to be diminished and he was subjected to harassment from leadership when he opposed the fraudulent conduct, and was seen as an obstacle to inappropriate admissions that did not meet the Government Payor criteria for IRF admissions. Ultimately, the Relator's refusal to participate in the fraudulent conduct culminated into clear retaliation in September 2019. On or about September 19, 2019, the Relator was asked to sign a pre-admission screening form for a patient who was already in route to the hospital.  Relator complained to the CEO, Carey Swanson, that he is being made to just rubber-stamp admissions and that his comments are being deleted from the pre-admission screening forms.

17.    The next day, on September 20, 2019, Relator was hand-delivered a letter from the CEO, Carey Swanson, informing Relator of a ninety (90) days' notice of Defendants' termination of Relator's contractor agreement, thereby removing Relator as the Associate Medical Director, effective December 19, 2019.

18.    Immediately thereafter, Relator was disinvited from attending leadership meetings

and was not allowed to even review the pre-admission screenings during a December 2019 meeting with CEO, Swanson, since he was no longer the Associate Medical Director, as Swanson wanted the process streamlined to involve only one physician, the Medical Director over Defendant Tidelands Health, Dr. Lisa Tarbert-Smaldone.

19.     As a result, the Medical Director, Dr. Tarbert-Smaldone, assumed a much larger role at Defendants' Little River facility in South Carolina, and, with it, admitted a much larger percentage of patients to her own service.  In turn, Relator assumed a more passive role and was relegated to admitting patients that were previously approved by Dr. Tarbert-Smaldone, without the benefit of reviewing the majority of patient cases, and Relator remained in this role until he had no choice but to terminate his contract with Defendants on May 11, 2020.

### B.    The Defendants

20.     Defendant Encompass Health Corporation (hereinafter "Encompass Health"), is a publicly-traded for-profit corporation (NYSE: EHC), incorporated in the State of Delaware, with its principal address and mailing address at 9001 Liberty Parkway, Birmingham, Alabama 35242, and registered agent, CT Corporation System, at 2 North Jackson Street, STE 605, Montgomery, Alabama 36104. Website address is www.encompasshealth.com.

21.     Defendant Encompass Health was formerly known as "HealthSouth Corporation" (NYSE: HLS) until the corporate name was changed on or about January 1, 2018.

22.     According to Defendant Encompass Health's 10-K filing for 2020 with the Securities and Exchange Commission ("SEC"):

> We are the nation's largest owner and operator of inpatient rehabilitation hospitals in terms of patients treated, revenues, and number of hospitals. We provide specialized rehabilitative treatment on both an inpatient and outpatient basis. We operate hospitals in 35 states and Puerto Rico, with concentrations in the eastern half of the United States and Texas. As of December 31, 2020, we operate 137 inpatient rehabilitation hospitals and manage four inpatient rehabilitation units

through management contracts. Our inpatient rehabilitation segment represented approximately 77% of our Net operating revenues for the year ended December 31, 2020. (*See* 10-K Filing FY 2020, *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0000785161/05dc7aa3-a7ea-4817-af7c-a769864c3c56.pdf).

23.     Defendant Encompass Health reported to the SEC revenue earnings for its inpatient rehabilitation division that continues to grow each year, to-wit:

| FY | Net Operating Revenues (in Millions) |
|---|---|
| 2020 | $3,496.1 |
| 2019 | $3,423.5 |
| 2018 | $3,247.9 |

*See* 10-K Filing FY 2020, *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0000785161/05dc7aa3-a7ea-4817-af7c-a769864c3c56.pdf.

24.     Defendant Encompass Health reported to the SEC the following regarding the size of its inpatient rehabilitation division that continues to grow each year, to-wit:

| FY | Number of Hospitals (actual amount) | Discharges (actual amount) | Number of Licensed Beds (actual amount) |
|---|---|---|---|
| 2020 | 137 | 181,897 | 9,505 |
| 2019 | 133 | 186,842 | 9,249 |
| 2018 | 130 | 179,846 | 8,966 |

*See* 10-K Filing FY 2020, *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0000785161/05dc7aa3-a7ea-4817-af7c-a769864c3c56.pdf.

25.     Defendant Encompass Health operates and/or owns numerous IRF facilities through its various subsidiaries throughout the United States each of which are closely monitored by Encompass Health's corporate office to ensure profitability.

26.     During the relevant timeframe, Defendant Encompass Health operated rehabilitation hospitals, which are defined under Medicare Part A as IRFs, in six (6) regions across the United States:  Central, Mid-Atlantic, Northeast, Southeast, Southwest, and West.

27.     Each region contains numerous subsidiaries that are managed by their respective CEOs, and the CEOs, in turn, report to the Regional President of their region.

28.     During the relevant timeframe, Defendant Encompass Health operated more than twenty-two (22) inpatient rehabilitation IRF hospitals in the Mid-Atlantic region.

29.     The Regional President for the Mid-Atlantic region is Ed Mowen. Mowen was employed by Defendant Encompass Health since 2005 up until his recent retirement in or around February 2021.  As Regional President, on information and belief, Mowen reported directly to the CEO of Defendant Encompass Health, Jack Tarr.

30.     As the Regional President of the Mid-Atlantic region, Ed Mowen was responsible for over twenty-two (22) inpatient rehabilitation IRF facilities that are operated by Defendants in Maryland, North Carolina, South Carolina, Virginia, West Virginia, and parts of Tennessee.

31.     One of the CEOs reporting to Regional President, Ed Mowen, is Carey Swanson, who has been the CEO since 2018 of Defendant, Myrtle Beach Rehabilitation Hospital, LLC d/b/a Tidelands Health Rehabilitation Hospital, an affiliate of Encompass Health (hereinafter "Tidelands Health").

32.     As of the date of this filing, Defendant Tidelands Health is a for-profit corporation incorporated in the State of Delaware, with its main hospital facility, Tidelands Waccamaw Community Hospital, located at 4070 US Highway 17 Bypass South, Murrells Inlet, SC 29576, and its registered agent is CT Corporation System, 2 Office Park Court STE 103, Columbia, South Carolina, 29223.

33.     Defendant Tidelands Health maintains an active organizational NPI (NPI: 1003312521) with its Authorized Official registered as Vice President, Robert M. Wisner and mailing address at 9001 Liberty Pkwy, Birmingham, Alabama, 35242-7509, according to the

NPPES NPI Registry for Tidelands Health, *available at* https://npiregistry.cms.hhs.gov/registry/provider-view/1003312521.

34. As of the date of this filing, Defendant Tidelands Health has two (2) IRF locations in South Carolina:

- 4070 Hwy 17 Bypass South, Murrells Inlet, SC 29576 (hereinafter "Murrells Inlet")

- 100 Water Grande Boulevard, Little River, SC 29566 (hereinafter "Little River")

35. Defendant Tidelands Health's locations, Murrells Inlet and Little River, are listed as the Primary and Secondary Practice Addresses, respectively, in its NPPES NPI Registry, *available at* https://npiregistry.cms.hhs.gov/registry/provider-view/1003312521.

36. Defendant Encompass Health's Vice President of Medical Services is Dr. Joseph Stillo, M.D., Ph.D. Dr. Stillo also now serves on Defendant Encompass Health's Physician Advisory Board, and the Physician Executive to the ACE IT project. Dr. Stillo was originally hired by Defendant Encompass Health f/k/a HealthSouth Corporation in 1998, as the Medical Director for HealthSouth Rehabilitation Hospital of Toms River in New Jersey.

37. Defendant Dr. Lisa S. Tarbert-Smaldone (also known as "Dr. Smaldone") has been the Medical Director of Defendant Tidelands Health since January 2019.

38. Defendant Dr. Tarbert-Smaldone is a resident of the Myrtle Beach area, Horry County, South Carolina.

39. As of the date of this filing, Defendant Tidelands Health's Medical Director, Dr. Lisa Tarbert-Smaldone, has an active NPI (NPI No. 1891794236), her primary taxonomy is Internal Medicine under her South Carolina Medical License (No. 26891), and her Medicaid number for South Carolina is No. 268917, according to her NPPES NPI Registry, *available at* https://npiregistry.cms.hhs.gov/registry/provider-view/1891794236.

40. Further, Dr. Tarbert-Smaldone's Primary Practice Address is listed as 820 67th Ave N. #70692, Myrtle Beach, SC 29572-2957, and her Secondary Practice Address is listed as 107 Woodwind Ct, Myrtle Beach, SC 29572-4119, according to her NPPES NPI Registry. (*Id.*).

41. As of the date of this filing, Dr. Tarbert-Smaldone's South Carolina Medical License is No. 26891, and her profile with the South Carolina Board of Medical Examiners lists her address as Encompass Health Rehab, 4070 Highway 17 FL 4, Murrells Inlet, South Carolina 29576-5033; her specialty is listed as "IM PD" which "IM" is Internal Medicine and "PD" is Pediatrics; and she is currently listed as supervising four (4) individuals—Mary Lucille Harding, APN; Melissa S. Gartner, APN; Lindsey Brooke Jernigan, APN; Matthew D. Zeuschner, APN. Dr. Tarbert-Smaldone is also currently listed having two (2) hospital affiliations:  Grand Strand Regional Medical Center and Tidelands Waccamaw Comm Hospital. (*See* Dr. Tarbert-Smaldone Medical Verification Profile, *available at* https://verify.llronline.com/LicLookup/Med/Med.aspx?div=16&AspxAutoDetectCookieSupport =1).

42. Dr. Tarbert-Smaldone, through her private medical practice, employs the majority of the physicians to work at Defendant Tidelands Health locations, including Drs. Evelyn Parish, Marlo Bruno, and Donny King.

43. Dr. Tarbert-Smaldone, also through her private medical practice, employs various Nurse Practitioners to work at Defendant Tidelands Health locations, including Mary Harding, Lindsey Jernigan, and Jessica Iono.

44. On information and belief, the private medical practice Dr. Tarbet-Smaldone owns and operates to employ these physicians and Nurse Practitioners is Advanced Disease Physicians, Inc. (NPI: 1417301896), a corporation incorporated in the State of South Carolina since February

19, 2016, and its registered agent, Lisa Tarbert, located at 107 Woodwind Ct, Myrtle Beach, South Carolina, 29572.

45.     Dr. Tarbert-Smaldone's private medical practice effectively hires and supplies the physicians working at Defendant Tidelands Health which is likely why Defendants' website emphasizes: "*Dr. Smaldone is an independent private practice physician*" (Dr. Smaldone's Biography Website Excerpt, *available at* https://www.encompasshealth.com/locations/tidelandshealth-murrellsinlet) (emphasis in original), to give the appearance of neutrality, because the other physicians at the Tidelands Health locations are considered to be under Dr. Tarbert-Smaldone working at her instruction and direction.

46.     But, in reality, Dr. Tarbert-Smaldone works closely with Defendants' leadership, including the CEO over Tidelands Health, Carey Swanson, to accomplish the fraudulent schemes as alleged herein. With Dr. Tarbert-Smaldone acting as the Medical Director of Defendant Tidelands Health, she is able to control, direct, and instruct the physicians working at Tidelands Health—the majority of which happen to also be her employees through her private medical practice, Advanced Disease Physicians, Inc., where she is employed as the CEO—to engage in the fraudulent conduct identified herein, such as pressuring the physicians to admit patients who are not appropriate for IRF services (such as non-CMS-13, too sick to participate in IRF, etc.) and those patients are then assigned a false diagnosis to justify IRF admission.

47.     Dr. Jeffrey C. Wilkins, Physical Medicine and Rehabilitation, was previously employed as the Medical Director at the inception of the rehab unit at Defendant Tidelands Health before Defendant Encompass Health took over in 2018. Dr. Wilkins' South Carolina Medical License (registered address: 631-A Bellamy Ave, Murrells Inlet, SC 29576) is No. 18847.

48.     Dr. Evelyn M. Parish, Internal Medicine, is employed by Dr. Tarbert-Smaldone's

private medical practice, assigned to work for Defendant Tidelands Health. Dr. Parish's South Carolina Medical License (registered address:  Tidelands Health 606 Black River Road, Georgetown, SC, 29440) is No. 654.

49.     Dr. Donald C. King, Internal Medicine, was previously employed by Dr. Tarbert-Smaldone's private medical practice, assigned to work at Defendant Tidelands Health. Dr. King's South Carolina Medical License (registered address: Tidelands Health, 100 Water Grande Blvd., Little River, SC 29566) is No. 22922, and has NPI No. 1528066263.

50.     Dr. Thanigaiarsu Thiyagarajan, Internal Medicine, is employed by Dr. Tarbert-Smaldone's private medical practice, assigned to work at Defendant Tidelands Health. Dr. Thiyagarajan's South Carolina Medical License (registered address: Grand Strand Medical Center, 809 82nd Pkwy, Myrtle Beach, SC, 29572) is No. 38632, and has NPI No. 1043475049.

51.     Dr. Richard Scott Krupkin, Physical Medicine and Rehabilitation, was contracted by Locum Tenans, LLC, assigned to work at Defendant Tidelands Health. Dr. Krupkin's South Carolina Medical License (registered address:  3121 Coleridge Road, Cleveland, OH 44118) is No. 52131, and has NPI No. 1548489040.

52.     Dr. Diana M. Whiteman, Physical Medicine and Rehabilitation, was contracted by Locum Tenans, LLC, assigned to work at Defendant Tidelands Health. Dr. Whiteman's South Carolina Medical License (registered address: N/A) is No. 81943, and has NPI No. 1366490419.

53.     Dr. Gregory Samson, Physical Medicine and Rehabilitation, Spinal Cord Injury Medicine, was contracted by Locum Tenens, LLC, assigned to work at Defendant Tidelands Health. Dr. Samson's South Carolina Medical License (registered address: Tidelands Health Rehabilitation Hospital, 4070 Highway 17, Murrells Inlet, SC 29576) is No. 36515, and has NPI No. 1962690487.

54.     Dr. David B. Turk, Physical Medicine and Rehabilitation, was contracted by Locum Tenens, LLC, assigned to work at Defendant Tidelands Health. Dr. Turk's South Carolina Medical License (registered address: N/A) is No. 82493, and has NPI No. 1972820892.

55.     Dr. Marlo D. Bruno, Internal Medicine and Physical Medicine and Rehabilitation, is employed by Dr. Tarbert-Smaldone's private medical practice, assigned to work at Defendant Tidelands Health. Dr. Bruno's South Carolina Medical License (registered address: Georgetown Memorial Hospital, 606 Black River Road, Georgetown, South Carolina 29442) is No. 36712.

56.     In addition to Dr. Tarbert-Smaldone working for Defendants and acting as CEO of Advanced Diseases Physicians, Inc., Dr. Tarbert-Smaldone is also the Medical Director of at least two (2) nursing homes and/or assisted living facilities in the Myrtle Beach, SC, area.

57.     Because Dr. Tarbert-Smaldone has the additional job duties and responsibilities, she relies extensively on her employed Nurse Practitioners and Internal Medicine physicians to do the day-to-day management of her patients at Defendant Tidelands Health.

58.     At all times material hereto, Dr. Tarbert-Smaldone refers her other patients in nursing home/assisted living for IRF therapy at one of Defendants' facilities, effectively referring patients to herself and, in this regard, Advanced Disease Physicians, Inc.'s primary taxonomy is an Assisted Living Facility under Dr. Tarbert-Smaldone's South Carolina License Number (No. 26891), according to the NPPES NPI Registry for Advanced Disease Physicians, Inc., *available at* https://npiregistry.cms.hhs.gov/registry/provider-view/1417301896.

59.     On May 1, 2020, for example, Dr. Tarbert-Smaldone admitted one of her own patients, Patient 1, a Government Payor beneficiary from an assisted living facility in the area where Dr. Tarbert-Smaldone works, and she continues to refer herself patients through the date of this filing.

60.     Relator is not alleging FCA violations for any of the conduct covered that Defendants previously resolved in prior FCA cases, nor that Defendants violated any corporate integrity agreements as the basis by itself as an FCA violation.  Rather, the false claims that are the subject of the Complaint are separate and identifiable acts of fraud that took place before, during, and after Relator's tenure and are based on Relator's firsthand knowledge.

61.     Despite previously paying millions of dollars to resolve previous FCA violation allegations, however, Defendants continue to engage in blatant and rampant fraud, including using false diagnoses to justify IRF admissions that are unsupported by any clinical evidence, as alleged herein, as Relator has personally observed Defendants continuing to engage in similar fraudulent schemes to justify IRF admission and increase the amount of reimbursement from Government Payors by any means necessary. In fact, Defendants specifically pivoted from using one false blanket diagnosis of "disuse myopathy," after Defendants were caught using this diagnosis in one of the FCA lawsuits, to using another false blanket diagnosis of "critical illness myopathy," which is an even more extreme and debilitating illness and diagnosis, to justify the IRF admissions of Government Payor patients across its IRF facilities. (*See infra*, Section VII.A).

62.     Defendants' fraudulent conduct, as alleged herein, exceeds at least $1 million dollars per year that is paid by Government Payors.

## V.      SOURCE OF RELATOR'S ALLEGATIONS AND RELATOR'S PRE-FILING DISCLOSURE

63.     The Relator has direct, independent, and personal knowledge of the information and evidence on which the allegations this Complaint are based, which were obtained directly by Relator, through his own labor and efforts. Additionally, the Relator made a pre-filing disclosure to the government of the information contained herein.  Further, in early 2020, the Relator reported Defendants' fraudulent conduct described herein and provided relevant information to agents of

CMS and OIG. (*See infra*, at Section VII.K regarding Relator's prior disclosures to the Government). Relator is, therefore, an original source of this information within the meaning of the False Claims Act, 31 U.S.C. § 3730(e), as well as via documents, communications, and records substantiating Relator's reports of the fraudulent conduct.

## VI.     LEGAL FRAMEWORK

### A.     <u>The Federal False Claims Act</u>

64.     The False Claims Act ("FCA") provides, in pertinent part, that any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); [or]

....

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000…plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a).

The Affordable Care Act requires a person who has received an overpayment of Medicare or Medicaid to report and return the overpayment within sixty (60) days of identification or the date any corresponding cost report is due, and failure to report and return the overpayment is an obligation for the purposes of the False Claims Act under 31 U.S.C. § 3729(a)(1)(G). *See* 42 U.S.C. § 1320a-7k(d).

65.     For purposes of the FCA:

(1) the terms "knowing" and "knowingly"

(A) mean that a person, with respect to information – (1) has actual

knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b). Effective November 2, 2015 (the date of enactment of the Federal Civil Penalties Inflation Adjustment Act, Improvements Act of 2015, Public Law 114-74, sec. 701 ("2015 Amendments")), the penalties increased from a minimum-maximum per-claim penalty of $5,500 and $11,000 to $10,781 and $21,563.  The increased amounts apply to civil penalties assessed for violations occurring after November 2, 2015.  Violations that occurred on or before November 2, 2015, are subject to the previous penalty amounts.  On February 3, 2017, pursuant to the 2015 Amendments annual re-indexing of the FCA penalties for inflation, the civil penalties again increased to the current minimum-maximum per-claim penalty of $10,957 and $21,916.  On January 29, 2018, pursuant to the 2015 Amendments annual re-indexing of the FCA penalties for inflation, the civil penalties again increased to the current minimum-maximum per-claim penalty of $11,181 and $22,363.  Effective February 9, 2018, the Bipartisan Budget Act of 2018 increased the maximum civil penalties for federal health care program fraud occurring after February 9, 2018.

66.    Relator asserts in this Complaint that Defendants violated 31 U.S.C. § 3729(a)(1)(A) (knowingly presents or causes to be presented a false or fraudulent claim), § 3729(a)(1)(B) (knowingly makes, uses, or causes a false record or statement to obtain payment of a false or fraudulent claim), § 3729(a)(1)(C) (conspires to commit a violation of any subparagraph), and § 3729(a)(1)(G) (knowingly makes, uses, or causes creation of a false record or statement to conceal, avoid, or decrease an obligation to transmit money to the government).

### B.    The Medicare Program

67.    The Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program, was created in 1965 as part of the Social Security Act ("SSA") to pay the costs

of certain healthcare services for eligible individuals.[2]  The Secretary of Health and Human Services ("HHS"), an agency of the United States whose activities, operations, and contracts are paid from federal funds, administers the Medicare program through the Health Care Financing Administration ("HCFA"), a component of HHS.

68.    Medicare is a one hundred percent (100%) federally subsidized health insurance system for eligible Americans, including those aged sixty-five (65) and older, certain disabled people, and certain people with chronic diseases who elect coverage. 42 U.S.C. § 1395c; *see* 42 U.S.C. §§ 1395j-1395w.  Medicare is serving approximately 43 million elderly and disabled Americans.

69.    Under the terms and policies of insurance, Medicare only provides benefits for medically necessary services rendered by eligible and appropriately licensed providers. *See* 42 U.S.C. § 1395y(a)(1)(A). Medicare has no obligation to pay claims or provide benefits for unnecessary services.

70.    To participate in Medicare, a provider must sign and file a Provider Agreement with CMS promising compliance with applicable statutes, regulations, and guidance. 42 U.S.C. § 1395cc; 42 C.F.R. § 412.23(e)(1).  The agreement contains, among other things, a Certification through which the provider certifies that (1) it will abide by Medicare laws, regulations, and program instructions, and (2) it acknowledges that payment under the Medicare program is conditioned upon the claim and underlying transaction complying with such laws, regulations, and program instructions. Medicare service providers have a legal duty to familiarize themselves with Medicare's reimbursement rules, including those delineated in the Medicare Manuals. *Heckler v.*

---

[2] *See supra* at n.1 ("At all times stated herein, the term "Government Payors" also includes other government healthcare programs, including TRICARE/CHAMPUS 10 U.S.C. § 1071, *et seq.*, since said programs have similar requirements and have been similarly defrauded by Defendants, as alleged herein.").

*Cmty. Health Serv. of Crawford Co., Inc.,* 467 U.S. 51, 64–65 (1984).

71.     Providers are typically compensated for the services they provide to Medicare beneficiaries on a "fee-for-service" basis as determined by Medicare's fee schedule. 42 U.S.C. § 1395w-4. To obtain compensation, providers must deliver a compensable service, certify that the service was medically necessary for the health of the patient, certify that the service was personally furnished by the physician (or under his or immediate supervision), and determine the appropriate diagnosis and procedure code to describe the problem and service for billing.

72.     In order to bill Medicare, a provider must submit a form called the CMS 1500.  The form describes, among other things, the provider, the patient, the referring physician, the services provided by procedure code, the related diagnosis code(s), the dates of service, and the amounts charged.  The provider certifies on the CMS 1500 claim that the information provided is truthful and that the services billed on the form were "medically indicated and necessary."

73.     Reimbursement for Medicare claims is made by the United States through HHS. CMS is an agency of HHS and is directly responsible for the administration of the Medicare program.  CMS, in turn, contracts with private insurance carriers to administer and pay claims from the Medicare Trust Fund.  *See* 42 U.S.C. § 1395u.  Claims submitted for reimbursement are to be paid in accordance with the Social Security Act, Code of Federal Regulations, and Medicare Rules and Regulations promulgated by CMS.

74.     The relevant provisions of the Medicare Act define "overpayment" as "funds that a person receives or retains…to which the person, after reconciliation, is not entitled." 42 U.S.C. §1320a-7k(4)(b). Any party who receives an overpayment is required to report and return the funds to the Government, intermediary, carrier, or contractor, state in writing the reason(s) for the overpayment, and return the overpayment by the later of sixty (60) days after the date on which

the overpayment was identified or the date a corresponding cost report is due, if applicable.

        **C.**     **The Medicare Reimbursement Framework for IRFs**

      75.     By way of background, to be eligible to receive payments from Government Payors like Medicare for providing rehabilitation and therapy services, the IRFs such as Defendants must comply with the requirements of the Medicare and Medicaid programs.

      76.     Under these Government Payor programs, IRFs must meet a minimum percentage of a facility's total patient population, known as a "compliance threshold," to be deemed eligible for receive payments for providing IRF rehabilitation and therapy services.

      77.     The compliance threshold requires that sixty percent (60%) or more of the patient population must fall within one (1) of the thirteen (13) medical conditions (referred herein as "CMS-13" diagnosis) that qualify for the sixty percent (60%) threshold and which include: (1) Amputation, (2) Arthritis, (3) Brain injury, (4) Burns, (5) Congenital deformity, (6) Femur (hip) fracture, (7) Major multiple trauma, (8) Neurological disorders, including multiple sclerosis, motor neuron diseases, polyneuropathy, muscular dystrophy, and Parkinson's disease, (9) Spinal cord injury, (10) Stroke, (11) Systemic vasculidities with joint inflammation, resulting in significant functional impairment of ambulation and other activities of daily living that have not improved after an appropriate, aggressive, and sustained course of outpatient therapy services or services in other less intensive rehabilitation settings immediately preceding the inpatient rehabilitation admission or that result from a systemic disease activation immediately before admission, but have the potential to improve with more intensive rehabilitation, (12) Severe or advanced osteoarthritis (osteoarthrosis or degenerative joint disease) involving two or more major weight bearing joints with joint deformity and substantial loss of range of motion, atrophy of muscles surrounding the joint, significant functional impairment of ambulation and other activities of daily living that have

not improved after the patient has participated in outpatient therapy services or services in other less intensive rehabilitation settings immediately preceding the inpatient rehabilitation admission but have the potential to improve with more intensive rehabilitation, and (13) Knee or hip joint replacement, or both, during an acute hospitalization immediately preceding the inpatient rehabilitation stay and also meet one or more of the following specific criteria: (A) Patient underwent bilateral knee or bilateral hip joint replacement surgery during the acute hospital admission immediately preceding the IRF admission, or (B) Patient is extremely obese with a Body Mass Index of at least fifty (50) at the time of admission to the IRF, or (C) Patient is age eighty-five (85) or older at the time of admission to the IRF.

78.     By maintaining the sixty percent (60%) compliance threshold, and therefore IRF accreditation, the IRFs are thereby exempt from the acute hospital prospective payment system. If a hospital does not meet this sixty percent (60%) threshold, then it loses this distinction from a typical acute hospital and loses the IRF accreditation, and therefore will lose the IRF payment classification, and instead will be categorized as a general acute care hospital.

79.     Under Medicare, the United States reimburses IRFs, like Defendants, for costs expended on therapy and rehabilitation services that are provided to qualifying Medicare beneficiaries based on the amount of resources the IRF is expected to spend to rehabilitate the beneficiaries pursuant to a per-discharged prospective payment system. Because the amount of reimbursement to the IRF is tied to the amount of resources the IRF is expected to use for the beneficiaries' rehabilitation, higher disability ratings at admission - or, as explained below, lower functional abilities and goals (known as "Section GG" in the CMS required Inpatient Rehabilitation Facility – Patient Assessment Instrument, formerly known as "Functional Independence Measure" prior to October 2019) (hereinafter "Section GG scores") at admission –

resulting in higher Medicare reimbursement amounts.

80.     The prospective payment system for IRFs requires that clinicians use a patient assessment instrument to evaluate each patient's level of disability at admission.  Defendants' staff are required to use the detailed Section GG scores/Functional Independence Measure scoring system to assess each patient's abilities within the first seventy-two (72) hours after admission to determine the patient's Section GG scores/Functional Independence Measure at admission.

81.     The IRF facilities then provide Government Payors, like Medicare, with information about each patient, including impairment codes and Section GG scores/Functional Independence Measure data.

82.     Government Payors, like Medicare, require the IRF clinicians (nurses, aides, and therapists) to follow a specific process when administering the Section GG scores/Functional Independence Measure.

83.     As part of the Section GG scoring/Functional Independence Measure assessment, the evaluator, such as a nurse, aide, or therapist records information that the PPS coordinator uses to determine the patient's Unadjusted Federal Prospective payment as determined in Impairment Group Code, as well as Average Length of Stay, that best depicts the primary reason for the patient's admission to a rehabilitation program (*e.g*., stroke, brain dysfunction), and thereafter allows the facility to bill for the anticipated reimbursement cost for services rendered after the patient is discharged from the facility.

84.     The evaluator must total the scores from the Section GG scoring/Functional Independence Measures of these assessments in order to determine the Admission Motor Score. The evaluator also totals the Functional Independence Measure scores from five (5) other assessments to determine the Admission Cognitive Score. The evaluator then uses the Admission

Motor Score and Admission Cognitive Scores (and sometimes the patient's age) to assign the patient to a Case-Mix Group ("CMG"). The CMG is used in patient classification systems to group patients with similar characteristics, such as similar clinical conditions presented and/or resources needed to provide treatment, together.

85.    The evaluator then assigns patients to different "tiers" based on the existence and severity of comorbid disorders, which is the presence of one or more disorders (or diseases) in addition to a primary disease or disorder, or the effect of such additional disorders or diseases. Each CMG/comorbidity tier combination is assigned a relative weight that is supposed to represent the resources the hospital will expend to support the patient's rehabilitation.

86.    Government Payors take the relative weight from the CMG and multiplies it by a budget-neutral conversion factor to determine the federal prospective payment that Medicare will pay. Next, Government Payors apply adjustments to the federal prospective payment to determine the amount of reimbursement that the hospital will ultimately receive for the rehabilitation IRF services provided. These adjustments include case-level and facility-level adjustments.

87.    Case-level adjustments are patient-specific payment adjustments that are made if the patient passes away during rehabilitation treatment, the length of stay was interrupted, or the cost of the patient's care was atypically high.

88.    Facility-level payment adjustments are made to account for wages in the facility's geographic area (*i.e.*, the wage index), the facility's share of low-income patients, and whether the facility is located in a rural area.

89.    The IRF staff enters the data from Section GG/Functional Independence Measure for each patient into a computerized entry system for IRFs that allows users to collect the IRF Patient Assessment Instrument in a database and import/export that data in standard CMS record

format that is then used by CMS for payment purposes.

90.    Defendants are responsible for completing an IRF Patient Assessment Instrument for each discharged patient for whom it seeks payment by CMS, and each facility is responsible for submitting the completed IRF Patient Assessment Instrument, which contains the Section GG scores/Functional Independence Measure data electronically to CMS.

91.    IRF rehabilitation therapy and services must meet the reasonable and necessary criteria to be eligible for reimbursement from Government Payors like Medicare, which includes key decision points considered and documented when making a decision to admit, retain, or discharge an IRF patient; certain pre-admission requirements; a post-admission physician evaluation to verify the patient's pre-admission; and specific requirements for an overall plan of care for each individual.

92.    To be considered reasonable and necessary IRF therapy and rehabilitative services by Government Payors, the IRFs must determine in relevant part, that the patient is: (A) Medically stable to benefit from IRF services but continue to require 24/7 medical and nursing care; (B) Needs the coordinated care of multiple therapy disciplines unique to IRFs; (C) Benefits from the intense rehabilitation therapy programs unique to IRFs; (D) Requires close medical supervision to manage the medical conditions to support participation in an intense rehabilitation therapy programs; (E) Possess the cognitive ability to understand commands and retain information; and (F) Able to tolerate three (3) hours of therapy five (5) days a week and make measurable improvement during their IRF stay.

93.    Government Payors will only reimburse IRFs for reasonable and necessary IRF services when the above criteria is met. Patients improperly admitted do not meet this criteria, such as with an upcoded and/or falsified diagnosis to justify IRF therapy and/or the CMS-13

compliance threshold, in order to receive payment for IRF would be considered fraudulent and a false claim, and all requests and/or payments made for such patients are in violation of the FCA.

## VII.    NARRATIVE OF PARTICULARS

94.    Defendants routinely engage, and conspire to engage, in fraudulent billing schemes, as identified herein, with one singular goal:  Increase profits.

95.    The fraudulent schemes employed by Defendants to accomplish this goal are set forth in the following subsections, to-wit:  (A) falsely admitting and retaining patients who do not qualify for IRF, including re-classifying non-CMS-13 patients to a CMS-13 compliant diagnosis in order to justify IRF admission and also meet the sixty percent (60%) compliance threshold required by Government Payors for IRFs; (B) Falsifying Patient Assessment Instrument forms by artificially decreasing scores at admission and increasing scores at discharge; (C) Falsifying patients' lengths of stay and deliberately delaying or extending discharge when patients have met or exceeded therapy goals to maximize reimbursement; (D) Falsely re-admitting patients for IRF therapy for the same or similar diagnosis that patients previously completed, known as "second chance" admissions; (E) Billing for inappropriate and unnecessary "consultations" during the patients' IRF therapy stays; (F) Motivating employees to engage in the fraud with required quotas and cash bonuses; (G) Training and incentivizing employees to engage in the fraudulent schemes; (H) Utilizing non-Physical Medicine and Rehabilitation Medicine physicians, such as Internists, to carry out the fraudulent schemes; (I) Additional representative false claims; (J) Retaliating against employees who object to and/or refuse to participate in the fraudulent schemes; (K) Relator's initial reports to the Government regarding the fraudulent conduct described herein.

### A.    Falsely Admitting and Retaining Patients Who Do Not Qualify for IRF

96.    During the relevant time periods, Defendants train and instruct employees to admit

Government Payor patients with a non-CMS-13 diagnosis, that do not qualify to be admitted for IRF therapy with the required criteria, but then misrepresent the patients' condition by converting and/or upcoding the diagnosis to a CMS-13 compliant diagnosis to justify the patients' IRF admission and services, thereby resulting in Defendants to receive substantial payments from Government Payors.

97.     Defendants are highly motivated to engage in this conduct in order to ensure that the sixty percent (60%) of the cases admitted in the IRFs fall under the CMS-13 diagnosis to ensure the IRF compliance threshold required by Government Payors.

98.     Due to the various fraudulent schemes, as set forth herein, the Defendants' IRF facilities actually have, on paper, a percentage of CMS-13 compliant diagnosed patients much higher than the sixty percent (60%) threshold; some IRF facilities even claim as high as eighty percent (80%) compliance.  The significance of such a high percentage is that Defendants are able to continue admitting non-CMS-13 diagnosed patients without concern that it will fall below the sixty percent (60%) threshold, and further, by falsely converting and/or upcoding patients as CMS-13-diagnosis, it results in a much larger reimbursement from Government Payors.

99.     To accomplish this goal, Defendants routinely admit patients for IRF who are not eligible for admission under Government Payors' eligibility criteria by falsely diagnosing patients to make them appear eligible, and therefore receive reimbursement from Government Payors.

100.     Attached hereto as Exhibit 1 is a spreadsheet of representative false claims of Government Payor patients (Medicare) that were improperly admitted by Defendants to the Tidelands Health locations for IRF services using a falsified diagnosis.

101.     Defendants received reimbursement from Government Payors for each of the patients identified in Exhibit 1, but had the patients' true diagnosis been revealed, Government

Payors would not have reimbursed Defendants because the patients would not have been eligible for IRF therapy.

102.    Of the representative false claims identified in <u>Exhibit 1</u>, among the CMS-13 diagnoses, Defendants frequently target as a false diagnosis either "disuse myopathy" or "critical illness myopathy," as these CMS-13 diagnoses were routinely "suggested" by management as a justification for IRF admission.

103.    For example, <u>Patient 2</u>, a Medicare beneficiary, was admitted for IRF therapy on two separate occasions about one month apart by Dr. Tarbert-Smaldone. The first IRF admission was direct from home on November 21, 2019 to December 8, 2019, for "other unspecified myopathy" and then the second IRF admission was on January 8 to January 29, 2020 for "critical illness myopathy." In reality, Patient 2 had an acute hospital diagnosis of congestive heart failure, but this diagnosis somehow turned into a CMS-13 diagnosis of critical illness myopathy. Further, the Discharge note from Patient 2's referring physician did not mention critical illness myopathy.

104.    <u>Patient 3</u>, a Medicare beneficiary, was approved for IRF admission by Dr. Tarbert-Smaldone, and stayed from December 31, 2019 to January 4, 2020. Patient 3's pre-admission screening ("PAS") form noted aspiration pneumonia. Patient 3's admission evaluation did not document critical illness myopathy because such a diagnosis was not indicated. However, Patient 3 was thereafter seen by Dr. King, one of the physicians employed by Dr. Tarbert-Smaldone's private medical practice, and Dr. King added "critical illness myopathy" as Patient 3's diagnosis which was then submitted by Defendants to Government Payors for reimbursement.

105.    <u>Patient 4</u>, a Medicare beneficiary, had end stage renal disease, atrial flutter, and a prior left below knee amputation, and was admitted for IRF therapy on January 28, 2020. However, Patient 4 was thereafter seen by Dr. King as a "consult" and Dr. King added "critical illness

myopathy" as the diagnosis, despite Dr. King's own physical examination of Patient 4 indicated "no focal deficits," which effectively contradicted such a diagnosis.

106.    Patient 5, a Medicare beneficiary, was admitted at the Little River facility due to multiple falls and renal failure on May 20, 2019. A Nursing Liaison staff member approached the admitting physician about adding "myopathy" to the clinical notes, which would have resulted in blatant upcoding to a CMS-13 diagnosis of H-Neurological. The admitting physician refused to diagnose Patient 5 with myopathy because there was no clinical evidence supporting such a diagnosis, and therefore Patient 5 was appropriately coded with a non-CMS-13 diagnosis of "X-other."

107.    However, once Dr. Tarbert-Smaldone's hired physicians began working for her, such as Dr. King, the diagnosis of "Critical Illness Myopathy" became much more prevalent and widespread, even when the underlying medical records did not support such a diagnosis.

108.    Similarly, Defendants' leadership, including the CEO of Defendant Tidelands Health, Carey Swanson, pressures the physicians to admit inappropriate patients for IRF therapy, including admitting said patients with false diagnoses.

109.    For example, on September 24, 2019, Swanson requested for Relator to admit a Medicare patient that did not qualify for IRF, Patient 6, and when Relator attempted to explain why the patient was ineligible for IRF therapy per the Government Payors' criteria, Swanson "suggested" for Relator to use the diagnosis of "myopathy" to justify the IRF admission. Relator refused to admit Patient 6 because the patient did not have myopathy; rather, Patient 6 only presented with back pain and a urinary tract infection. Later that same day, however, Relator's decision was overruled by the Medical Director, Dr. Tarbert-Smaldone, and Patient 6 was admitted with a false myopathy diagnosis. In response to Relator's complaint about Defendants

admitting Patient 6, Dr. Tarbert-Smaldone actually admitted that "inappropriate patients are being admitted to fill beds," referring to patients who were not eligible for IRF per Government Payors' conditions of payment. At that point, the Relator noticed that the PAS form he previously documented his refusal to admit Patient 6 mysteriously disappeared from Defendants' internal system and a new PAS had been created with Dr. Tarbert-Smaldone's signature approving Patient 6 for IRF admission with the pre-determined language of "Primary Acute Diagnosis: NEUROLOGICAL CONDITIONS" in the absence of any verifiable information in the PAS. This was the first time that the CEO, Swanson, directly involved the Medical Director, Dr. Tarbert-Smaldone, to override Relator's decision to deny the IRF admission, and thereafter Swanson began taking a more active role in pressuring the Relator to sign off on PAS forms after the PAS were sent to Relator.

110.    The above-described falsified admissions are rampant and intentionally occur as a result of how Defendants operate the IRF facilities, that is, primarily by marginalizing the medical judgment and decision-making of the Rehabilitation physicians, and instead, Defendants authorize and empower non-physicians, particularly Nurse Liaisons and other Admissions personnel ("Admissions/Nurse Liaisons") to decide the eligibility of patients' admissions and Case Managers to decide the eligibility of patients' discharges, including the patients' CMS-13 diagnosis, and/or Rehabilitation Impairment Category, and/or predetermining the classification, regardless of whether those patients actually met the IRF criteria per Government Payors' conditions of payment. In turn, Rehabilitation physicians are expected, and, at times, instructed to simply rubber-stamp the decisions that are made by the Admissions/Nurse Liaisons at admission, and Case Managers at discharge, and if the physicians refuse to do so, then their medical judgment is railroaded and/or circumvented by Defendants with the goal of ultimately

obtaining the patients' admission for IRF therapy.

111.    Defendants also admit inappropriate Government Payor patients who do not qualify for IRF because of their declined health status and are essentially "too sick" to participate in IRF therapy in order to get reimbursed by Government Payors. Several nurses and therapists, including Mary Shanks, Roberta (former ICU Nurse, last name unknown), Amanda (last name believed to be Goist), Lynn Marie (last name unknown) and others, have complained about Defendants admitting Medicare patients for IRF who are "too sick to participate in the therapy," and who would often have to be transferred to an acute hospital or skilled nursing facility due to their declined health condition.

112.    Examples of Government Payor patients who were admitted for IRF, but were too sick to participate in the therapy, include but are not limited to, Patient 7, who had congestive heart failure, chronic obstructive pulmonary disease, hemothorax, colonic cancer with liver mets, was admitted on two separate occasions from August 4 to August 12, 2019, and then again on August 20, 2019 to September 3, 2019; and Patient 8, who had a intracerebral hemorrhage as well as falsified diagnosis of critical illness myopathy, was admitted from March 13 to March 20, 2020.

113.    Defendants engage in a number of tactics to manipulate physicians to sign off on the Pre-Admission Screening ("PAS") forms as quickly as possible in order to have patients admitted for IRF, otherwise known as Defendants' "Rapid Admission Program:" Essentially, Defendants maintain a policy that all patient IRF referrals must be approved by physicians within two (2) hours of receiving the referral and physicians are immediately prompted to approve the completed PAS from the Admissions/Nurse Liaisons as soon as it is sent to the physicians. Defendants closely track and monitor how long it takes the Admissions/Nurse Liaisons to complete the PAS forms and then provide the forms to physicians for approval. Defendants likewise track

and monitor the physicians' turnaround time regarding how long it takes them to approve the PAS forms for IRF admissions, and if the physicians take longer than two (2) hours, then they are called out by the administration for being "too slow," even if the physicians insist on reviewing the complete patient record before approving the PAS. Physicians also receive multiple text messages from different members of the referral team and are often met in the hospital floors while conducting the face-to-face patient evaluations. Admissions/Nurse Liaisons send the physicians a list of the patients' PAS forms that need to be approved "as soon as possible" with the physician's signature, but no longer than two (2) hours per policy, while also asserting that those patients are either a "same day admission," and/or that the "patient is on the way" to the facility to be admitted, and/or that "we will lose this patient" to another facility if the patient is not admitted as soon as possible, and/or "we are waiting for you to sign the documents" because the patient is ready to be admitted.

114.    During the time the physicians are supposed to be reviewing records to determine if the patients are within the Government Payors' criteria for IRF eligibility, Defendants begin repeatedly calling and/or texting the physician to request the physician's immediate approval of the patients due to all or some of the above-listed reasons, and also have numerous other employees contact the physician to "remind" them of the patients that need to be approved as soon as possible.

115.    This constant badgering interferes with the physician's ability to meaningfully review the patients' records to determine whether IRF admission is appropriate or even consistent with Government Payors' criteria, and often results in the physician eventually caving in and approving non-qualifying patients for IRF admission.

116.    For example, on July 16, 2019, at the Murrells Inlet facility, one of the locums physicians, Dr. David Turk, blindly signed off on the PAS forms to admit numerous patients for

IRF, without reading their information to determine if the patients met the IRF criteria for eligibility. Dr. Turk instead simply clicked through several patient referrals, without reviewing the electronic records therewith, to approve all of the referred patients for IRF admission. When Dr. Turk was asked why he was doing this, Dr. Turk responded, "that's what they expect me to do."

117.    As a result of this constant pressure, the Relator complained on more than one occasion about the importance of having physician oversight and that Defendants were allowing other employees, like Admissions/Nurse Liaisons, to make the decisions on patients' IRF admission before the physicians had a chance to thoroughly review the patients' cases.

118.    If at any point during this process the physicians refuse to approve the PAS for IRF admission, then Defendants have implemented other procedures to challenge and effectively bypass the physician's decision and medical judgment, such as by having the PAS form automatically transferred and reviewed by another physician or even send the PAS form to another one of Defendants' affiliated IRF facilities. In the vast majority of these rejected cases, management over the Admissions/Nurse Liaisons, personnel, including the CEO, Carey Swanson, the Director of Business Development/Marketing, Ashley O'Sullivan, former Director of Business Development/Marketing, Jennifer Droppleman, and even Nurse Liaisons, such as Jacob Dill, challenge the physicians' decisions not to approve the PAS for IRF admissions, berate physicians for denying IRF therapy, accuse physicians of delaying IRF admissions, and then request that they reconsider for any number of reasons to justify IRF admissions.

119.    For example, in early 2020, the new Director of Business Development/Marketing at the time, Ashley O'Sullivan, and Nurse Liaison, Jacob Dill, challenged Dr. Evelyn Parish's decision to deny IRF admission for Patient 9, who did not qualify for IRF admission per Government Payors' criteria, and they were eventually able to get the denial reversed after

discussing it with Dr. Tarbert-Smaldone.

120.    If the physician still refuses to reconsider the rejection and not approve IRF admission, then Defendants will simply shift the patients' PAS form to another physician to be approved, effectively overriding the original denial, such as the case with Patient 6 in September 2019, and/or patients are also transferred internally between Defendants' own facilities if the patient is denied IRF at one facility so they will thereafter be admitted at another IRF facility. This effectively makes a mockery of the PAS process, physicians' medical judgment, and eligibility criteria for IRF admissions.

121.    In fact, in early 2020, the Medical Director, Dr. Tarbert-Smaldone, complained about the challenges she was facing by trying to screen patients for IRF admission and that she "could've gotten a higher stipend [from Defendants]" had she "not refused the condition imposed by the CEO [Carey Swanson] to sign every pre-admission screen or reverse denials that came [her] way." CEO, Swanson, attempted to impose this "condition" on Dr. Tarbert-Smaldone, by bribing her with additional compensation, to approve every patient for IRF without question and without regard to the patients meeting the IRF criteria for eligibility.

122.    The following examples illustrate how Defendants implemented these high-pressure tactics against Relator:  In January 2019, shortly after Relator began working as a locums physician at the Murrells Inlet facility, the Relator was instructed by the Director of Business Development/Marketing at the time, Jennifer Droppleman, to sign off on a PAS approving a patient's IRF admission.  As the Relator received the message to sign off on the PAS, he observed that the admission board in his facility already had the patient's name listed and a room was already assigned to the patient in the hospital for IRF, all of which was done before the Relator even had the chance to review the medical records to determine whether this patient met the IRF criteria

required by Government Payors. Relator asked for a meeting in the hospital unit on the same day and spoke with Droppleman and the Nurse Rehabilitation Liaison, Mike McKinley, to outline his approach on reviewing PAS forms and to emphasize his role in determining the appropriateness of an admission. During their meeting, Relator underscored the Government Payor (Medicare) guidelines that no patient should be admitted without physician approval. Relator's explanations were met with consternation by both Droppleman and McKinley, and further, McKinley indicated that Nurse Liaisons like himself essentially make the IRF admission decision over ninety percent (90%) of the time.

123.    Another routine occurrence that Defendants utilize to carry out the fraudulent IRF admissions: If one physician rejects a patient for IRF admission, that physician's decision and attesting paperwork denying IRF is mysteriously deleted (or scrubbed), and erased from history in Defendants' computer system, and then another physician would thereafter admit the patients for IRF, essentially circumventing and overriding the original denial.

124.    For example, on May 5, 2020, the Relator completed the PAS form for <u>Patient 10</u>, a Medicare beneficiary, and specifically checked "refuse" admission and then annotated the PAS, because the patient was not eligible for IRF admission under the Government Payor's criteria. However, the Relator's comments in the PAS form and his refusal to admit this patient were subsequently deleted (or, "scrubbed") from the PAS. After Relator's PAS comments and refusal to admit Patient 10 were deleted, a new PAS form was created the following day, May 6, 2020, and was submitted to the Medical Director, Dr. Lisa Tarbert-Smaldone, who then approved Patient 10 for IRF admission on May 6 and the patient was thereafter admitted on May 8, 2020, despite Patient 10 being ineligible for IRF therapy. Patient 10 was very upset upon admission, and even stated that he was "tricked" into coming to the hospital, and pushed hard to be discharged soon

after admission.

125.     At all times material hereto, Government Payors require that the Physician History, Physical, Assessment, and Post-Admission assessment must be completed within twenty-four (24) hours of the patient being admitted.

126.     The Physician Assessment and Diagnosis determines the patient's Case Mix Group ("CMG") and subsequent threshold compliance with the CMS-13 diagnosis. The PAS information on the primary diagnosis should be consistent with the Post-Admission Physician Evaluation and this typically determines the patient's impairment group code ("IGC"), which is the code that Government Payors rely on for IRFs to truthfully and accurately report to determine the patients' condition, and therefore, is a crucial step towards determining the amount of the reimbursement that Defendants will receive from Government Payors.

127.     After the patients' hospital stay for IRF therapy, at discharge, Defendants create a "Coding Worksheet" that identifies the CMG and CMS-13 diagnosis compliance and specifies diagnoses for every patient, and then Defendants submit this information to Government Payors like Medicare for reimbursement.

128.     During this process for submitting the claims for reimbursement, Defendants' physicians are not involved in determining the IGC. Rather, Defendants train and instruct non-physician employees, "coders," to enter the IGC for patients, instead of the physicians, thereby removing all autonomy from the physicians. For example, the employees responsible for entering the IGC at the Defendant Tidelands Health locations were one of three login names: "browns25" or "Kropp" or "Flynn." This creates a system that allows Defendants to take total control of the process and perpetuate the continued fraudulent inappropriate IRF admissions because the physicians do not enter the IGC themselves and the physicians are not directly involved in

determining the IGC as the Coding Worksheets are created after the patient is discharged. Therefore, the physicians would not be able to know whether the patient was assigned a CMS-13 compliant diagnosis or otherwise. As a result, terms such as "critical illness myopathy" and "disuse myopathy" are pre-ordained and affirmed by the Defendants for the sole purpose of fraudulently converting non-CMS-13 compliant patients to be a CMS-13 compliant diagnosis.

129.     The importance of influencing physicians to include these key diagnosis words (like "myopathy" or "encephalopathy") in physician documentation is critical to Defendants upcoding non-CMS-13 compliant patients. At the same time, the Admissions/Nurse Liaisons are apt to use canned statements to create a narrative suggesting a diagnosis like myopathy and/or pre-determining a patient's group code that is contrary to the presenting hospital condition or diagnosis, such as assigning "Neurological Condition" to a patient with a urinary tract infection. This underscores why Defendants' employees, such as the CEO of Tidelands Health, Carey Swanson, encourage a particular diagnosis like "myopathy" and reinforce the targeted diagnoses in the educational resources provided to physicians, such as PowerPoint presentations, and also face-to-face encounters initiated by employees of the Defendants. (*See infra*, at Section VII.G regarding Defendants' corporate training).

130.     Defendant Encompass Health closely monitors and tracks the patient censuses of its IRF facilities, and decides the ideal "target budget" for each such facility to ensure profitability.

131.     For example, in a "Physician Collaboration Meeting" on October 31, 2019, Defendant Tidelands Health's CEO, Carey Swanson, announced that "corporate" Encompass Health has a "target budget" for Tidelands Health at a "total of 60 patients for both facilities," and Swanson insisted that Tidelands Health stay within this target budget at all times. At that time, in October 2019, Tidelands Health was meeting its "Census Goals" because there were twenty-five

(25) patients at the Murrells Inlet location and thirty-seven (37) patients at the Little River location for a total of sixty-two (62) patients.

132.     As of the date of the October 31, 2019, meeting, Defendant Tidelands Health had a CMS-13 diagnosis compliance rating from 2018-2019 that averaged 73.68%, and in the following year from 2019-2020, it averaged over 80%. The CEO, Carey Swanson, bragged on multiple occasions that their facilities had an 80%-plus compliance rating, since these compliance ratings are much higher than the 60% threshold required by CMS for IRF facilities to maintain their accreditation. However, these numbers were fraudulently manufactured by Defendant's and would be significantly lower if Defendants accurately reported the patients' true conditions and diagnoses at admission.

133.     Relator also made complaints to management in Defendant Encompass Health, but to no avail.  In August 2019, Regional President, Ed Mowen visited the Little River facility for a site check. After a conference meeting, Relator approached Mowen and the CEO, Carey Swanson, to complain about how the Relator was falsely accused of "interfering" with the IRF admission of a patient, which Relator conveyed to Mowen was due to the overall attitude of management whenever there was any denial or delay in the IRF admissions.  However, Mowen did not say anything in response.  Instead, Swanson interrupted Relator by stating to "not to go any further," and then Swanson and Mowen abruptly exited the conference room.

134.     Relator also complained to Defendant Encompass Health's VP for Medical Affairs, Dr. Joseph Stillo, on or about September 11, 2019, about how the team conferences are not complying with Government Payors' regulatory criteria, that staff have made false accusations and diagnoses to justify IRF admissions, and that Relator was berated by Defendant Tidelands Health for seeking and holding a meeting with the therapy staff when the Relator expressed concerns

about how the team conferences are not complying with Government Payors' criteria. (*See infra*, at Section VII.C regarding falsifying patients' lengths of stay). However, Dr. Stillo was dismissive of Relator's complaints, did not act at all surprised, and did not ask any follow-up questions. These same concerns are clearly common, and are also ignored, across Defendant Encompass Health's IRF facilities.

135.    The systemic and widespread nature of the fraudulent admissions was also confirmed by employees who had worked at other facilities operated by Defendant Encompass Health.  For example, on March 27, 2020, one of the Nurse Rehabilitation Liaisons at the Little River facility, Mike McKinley, made numerous statements regarding the admission of inappropriate patients for IRF therapy, including "90% of them [Defendants' facilities] do it that way" and "for 15 years, I made the decision 99.9% of the time." McKinley further stated that "a lot of Encompass unfortunately are like us. They don't have a big hospital to draw from" and "they want you to always find a reason to bring a patient, not for a reason not to bring a patient, so if you can find that one reason to bring them, you bring them."

136.    During another conversation with Nurse Liaison, Mike McKinley, on April 14, 2020, shortly before McKinley left the Murrells Inlet facility and joined another Defendant Encompass Health facility in Blufton, South Carolina, McKinley explained why Relator's comments in the PAS forms were being "selectively deleted" by Defendants. McKinley explained that "makes it less likely" for physicians to deny admissions and that the "liaisons make the decisions" just like "every other Encompass does."

137.    During this conversation on April 14, 2020, Mike McKinley also quoted the former Medical Director, Dr. Jeffrey Wilkins, who was replaced by Dr. Tarbert-Smaldone in 2018, as complaining that the patients were "not appropriate."

138.    In early 2020, the Director of Business Development/Marketing, Jennifer Droppleman, was demoted to Admission Liaisons after she failed to meet Defendants' quotas for target IRF admissions, and she was thereafter replaced by Ashley O'Sullivan, who was transferred from another Defendant Encompass Health facility in Florence, South Carolina, in order "to fix the issues of low admissions" at the Tidelands Health facilities.

139.    After the Relator began discovering the fraudulent schemes identified herein, on more than one occasion, he complained to the CEO, Carey Swanson, that he cannot rubber-stamp the false patient diagnoses to justify the IRF admissions, and this resulted in several arguments with Swanson—who is not a medical doctor—as well as subsequent retaliation due to Relator's persistent objections and refusal to engage in the fraudulent conduct, such as Swanson questioning Relator's "competency," accusing Relator of depriving patients medical care, and Swanson also falsely claimed that Medicare benefits "require" IRF therapy.

140.    Further, the Relator began noticing that his PAS forms were being deleted and/or edited whenever he would deny a patient for IRF admission, on September 19, 2019, the Relator questioned the Nurse Liaison Director, Roberta Hamilton, why there was "selective editing" of his comments in the patient PAS forms. Later that same day, September 19, 2019, during a leadership conference with the CEO, Carey Swanson, the Medical Director, Dr. Tarbert-Smaldone, and the Director of Business Development/Marketing, Jennifer Droppleman, the Relator questioned why his comments in the PAS forms were being deleted, and why there was "selective editing" to remove his comments regarding the reasons a patient was denied IRF admission. Relator also complained that he was asked by the Nurse Liaison, Jacob Dill, if he could sign off on a PAS for a patient that was already in route to the Little River facility for IRF admission, to which Relator stated to the CEO, Swanson, that he cannot just "rubber-stamp" each IRF admission that is sent to

him.

141.    As explained in detail below, the next day, on September 20, 2019, the CEO, Carey Swanson, provided Relator with a ninety (90) days' notice that his contract with Defendants was being terminated and he was being removed as the Associate Medical Director, effective December 19, 2019.

142.    As a result, in or around September 2019, the Medical Director, Dr. Lisa Tarbert-Smaldone, informed Relator that she would be coming to his location at Little River and that Defendants were actively looking for another physician to fill Dr. Tarbert-Smaldone's position at the Murrells Inlet location in order to move her to the Little River facility and essentially take over the direction of the Little River facility, in the clear attempt to push Relator out of his job.  During this transition, Dr. Tarbert-Smaldone and Relator both received PAS forms from the Admissions/Nurse Liaisons and then, on December 17, 2019, Relator was informed by the CEO, Carey Swanson, that Dr. Tarbert-Smaldone will be the sole reviewer of all PAS forms.

143.    On October 3, 2019, the Relator participated in a conference call with the three (3) executives that form the leadership of Defendant, Tidelands Health:  The CEO, Carey Swanson, the Director of Business Development/Marketing at the time, Jennifer Droppleman, and the Medical Director, Dr. Lisa Tarbert-Smaldone, essentially regarding the "admission criteria" of the patients falsely admitted at Defendants' IRFs, and a number of subjects were discussed, as Relator brought up his concerns about using the false diagnosis "encephalopathy" and/or "myopathy" for the IRF admissions, along with the push to bring patients from home health into the hospitals for IRF therapy.  Relator mentioned how he was surprised when the CEO, Swanson, tried to suggest a particular diagnosis for patients, and how she tried to take back her suggestion of "disuse myopathy" and actually said she meant "critical illness myopathy".

144.     During the October 3, 2019, conference call, the Relator also questioned the CEO, Swanson, regarding several of the patients being admitted with a urinary tract infection or pneumonia, and using the term "toxic metabolic encephalopathy" to justify the admission to the IRF, because these conditions had already resolved *before* those patients' IRF admissions. In response, Swanson stated that "the key is to get them [admitted] fast enough before it [their underlying conditions] resolves," but even when the underlying condition has resolved, the Defendants continue to use the "encephalopathy" to justify IRF admission. This is fraudulent since Defendants are admitting patients using criteria that clearly makes them ineligible to receive IRF benefits under the Government Payors' conditions of payment.

145.     During the October 3, 2019, conference call, the CEO, Swanson, also referenced a general statement from Medicare Benefit Manual, at Section 110 - Inpatient Rehabilitation Facility (IRF) Services, which provides, in relevant part:

> The inpatient rehabilitation facility (IRF) benefit is designed to provide intensive rehabilitation therapy in a resource intensive inpatient hospital environment for patients who, due to the complexity of their nursing, medical management, and rehabilitation needs, require and can reasonably be expected to benefit from an inpatient stay and an interdisciplinary team approach to the delivery of rehabilitation care.
>
> The IRF benefit is not to be used as an alternative to completion of the full course of treatment in the referring hospital. A patient who has not yet completed the full course of treatment in the referring hospital is expected to remain in the referring hospital, with appropriate rehabilitative treatment provided, until such time as the patient has completed the full course of treatment. Though medical management can be performed in an IRF, patients must be able to fully participate in and benefit from the intensive rehabilitation therapy program provided in IRFs in order to be transferred to an IRF. IRF admissions for patients who are still completing their course of treatment in the referring hospital and who therefore are not able to participate in and benefit from the intensive rehabilitation therapy services provided in IRFs will not be considered reasonable and necessary.
>
> Conversely, the IRF benefit is not appropriate for patients who have completed their full course of treatment in the referring hospital, but do not require intensive

<u>rehabilitation</u>.  Medicare benefits are available for such patients in a less-intensive setting.

(*See* Medicare Benefit Policy Manual, Chapter 1 – Inpatient Hospital Services Covered Under Part A, Section 110, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c01.pdf) (emphasis added).

146.   The October 3, 2019, conference call further confirmed that Defendants are applying an overly broad interpretation of "medical necessity" for inpatient rehab solely to justify admissions to the IRFs and have even stretched it to include admissions from the patients' homes, even if the Medicare Benefit Policy Manual (quoted above) primarily refers to "hospital referrals." Without a referral, Defendants cannot work up a patient for admission.  Once Defendants get a referral, they are going to mine it or shape it to justify the IRF admission, and therefore, reimbursement from Government Payors.

147.   On October 3, 2019, Defendant Tidelands Health's CEO, Carey Swanson, also sent out an email to Relator, the Medical Director, Dr. Tarbert-Smaldone, and others, with the subject line "Review of admission criteria" in regards to how Swanson was noticing the increase of the number of IRF denials, largely due to Relator's refusal to use false diagnosis to justify admission. In her email, Swanson's remark that Defendants are "not required to show that care could have been provided at a less intensive setting" runs counter to the specific instruction from Government Payors, including the Medicare Benefit Policy Manual, which states, in relevant part: "Conversely, the IRF benefit is <u>not</u> appropriate for patients who have completed their full course of treatment in the referring hospital, <u>but do not require intensive rehabilitation. Medicare benefits are available for such patients in a less-intensive setting</u>." (*See* Medicare Benefit Policy Manual, Chapter 1 – Inpatient Hospital Services Covered Under Part A, Section 110, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c01.pdf) (emphasis added). Essentially, the CEO, Carey Swanson, believes that every Government Payor

beneficiary, especially Medicare patients, that has a medical diagnosis and rehabilitation should come to IRF for rehab as part of their Medicare benefits.

**B.** **Falsifying Patient Assessment Instrument Forms: Artificially Decreased at Admission and Increased at Discharge**

148.    At all times material hereto, Government Payors require within three (3) calendar days for Defendants to complete the Initial Assessments of the patient's functional abilities and goals (known as Section GG in the CMS required Inpatient Rehabilitation Facility – Patient Assessment Instrument, formerly known as "Functional Independence Measure" prior to October 2019) measuring the patient's level of functional disability and the degree of the impairment.

149.    In turn, Government Payors like Medicare decide the amount of reimbursement to Defendants, in part, based on the patients' functional scoring in the IRF Patient Assessment Instrument forms, *e.g.*, lower scores in the initial assessments often result in longer IRF stays and, therefore, a higher reimbursement from Government Payors.

150.    At all times material hereto, the Defendants' therapy and nursing staff are responsible for determining the patients' functional independence scores at admission as well as at discharge.

151.    The IRF Initial Assessment scores allow Defendants to fraudulently game the system because Defendants' therapy and nursing employees are trained and instructed to "make the patients look sicker" at admission and then "improved" at discharge, *i.e.*, give patients artificially lower scores in their Initial Assessments to help justify longer stays in the eyes of Government Payors (like Medicare), and therefore higher reimbursement, and give those same patients higher scores in those same areas at discharge to make it appear as if the IRF therapy was successful.

152.    By fraudulently scoring the patients lower in their motor and/or functional

independence, this creates an impression that the patients are more impaired, increasing complexity, a higher tier, and/or must be kept longer than necessary in length of stay, therefore allowing Defendants to receive a higher reimbursement from Government Payors.

153.    At Defendant Tidelands Health in 2019 and 2020, several nurses and therapists, including Mary Shanks, Roberta (former ICU Nurse, last name unknown), Amanda (last name believed to be Goist), Lynn Marie (last name unknown), and others, complained that they are instructed and pressured to make the "patients look sicker than they are" and reflect a higher acuity in the IRF Patient Assessment Instruments.

154.    In a letter to the leadership of Defendant Tidelands Health, including the CEO, Carey Swanson, these employees complained that they are "being told exactly how to complete the FIM [Functional Independence Measure] so the outcomes will look better on paper, even if it's not really how the patient should be scored. They blame it on the FIM being 'really complicated,' but they are altering scores." To do this, the Nursing Administration and other department leaders use bullying, gaslighting, intimidation and retaliation in order to control their staff into artificially lower the patients' scores such as, motor and/or functional independence, on the Patient Assessment Instrument forms which are then submitted to CMS for purposes of reimbursement, and, in turn, increases the overall payment from Government Payors.

155.    The nurses and therapists further complained that they were instructed and pressured by management to perform these false assessments, especially by the Director of Quality/Risk, Christy Lachapelle, who will inform them if they did not "rate properly" in the IRF Patient Assessment Instruments.

156.    One such example of Defendants artificially decreasing a patient's scores at admission is Patient 11, a Medicare beneficiary, who was admitted at Defendants' Little River

facility from September 19 to September 26, 2019. Patient 11 was documented as barely able to walk as of September 21, 2019, and then Patient 11's ability to walk immediately progressed from one hundred fifty (150) feet to three hundred (300) feet in just one day. This immediate progression can only be explained by the fact that Patient 11's initial assessment scores were severely decreased at admission to justify a higher reimbursement from Government Payors.

157.    Likewise, at discharge, the therapy and nursing staff are expected to show "improvement" and a better outcome for the patients in those same scores that were artificially lowered at admission, in order to make Defendants' facilities appear as if the IRF therapy was successful.

158.    In turn, Defendants are able to artificially increase their IRF facilities' respective Quality Reporting Program Public Reporting, established by Section 30004(b) of the Affordable Care Act, which is supposed to provide an accurate snapshot of the quality-of-care metrics for each IRF facility. *See* Medicare Care Compare, *available at* https://www.medicare.gov/care-compare/.

### C.    Falsifying Patients' Lengths of Stay & Deliberately Extending Discharge

159.    In addition to falsely admitting patients for IRF, Defendants also retain patients for additional IRF therapy services instead of allowing them to be discharged at the appropriate time, in order to fraudulently increase their level of reimbursement.

160.    Government Payors like Medicare require Defendants to discharge patients once the patient has met their IRF rehab goals, or if the patients cannot participate in IRF rehab therapy due to their declined health.

161.    Defendants are supposed to hold multi-disciplinary team conference every seven (7) days for each IRF patient to make the determination on whether discharge is appropriate.  Prior

to the team conferences, the therapists are required to perform a thorough functional assessment once weekly. The physicians are required to have at least three (3) face-to-face encounters with the patient every week. Therapists and nurses have noted inappropriate admissions or altering functional scores to show either lower scores on admissions or higher scores upon discharge. Physician and therapy documentation are created and stored in an electronic medical record.

162.    However, Defendants instead define the discharge date to ensure full usage of the assigned days as decided by the Case Managers, as opposed to the treating physicians, according to what the RAND Corporation has published for the length of stay for a particular diagnosis or condition.

163.    Additionally, Defendants instruct employees to limit discharges to only three (3) or four (4) patients per day, so that the patient census is not too low. This was affirmed by the Defendants' Director of Case Management, Sheena Gaddis, on or about March 12, 2020, wherein she admitted that Defendants are "capping discharges to 3 or 4 [patients] per day." Gaddis further stated with respect to the patients' lengths of stay that "we are so dependent on the RAND number, we're not being clinicians anymore, including myself."

164.    To falsely retain these patients, Defendant Encompass Health has the Case Managers or Social Workers run the team conferences, instead of the physician, to decide the patients' lengths of stay and/or dates of discharge. This intentionally marginalizes the physician's medical judgment, and instead allows non-physicians to make decisions that artificially inflate daily census or length stays, even if the patients could go home earlier.

165.    Moreover, the CEO of the Defendant Tidelands Health, Carey Swanson, built on Encompass Health's system to further marginalize the medical judgment of the physicians: At the Tidelands Health locations, the patients' family members are also involved in these team

conferences and participate in the discharge decision. There is no interplay or discussion on the patients' functional status or barriers between the physician and staff, and instead, the team will just present the current functional status to the patient and the family members, educate the family members, answer their questions, and then the patients' discharge date is set by the Case Managers depending on what the RAND Corporation has recommended for the length of stay for the patients' diagnosis or condition. The presence of the patient and family members during the team conference prevents any candid discussions between the physician and staff on the appropriateness of discharge.

166.    For example, on September 13, 2019, Patient 12, a Medicare beneficiary, was admitted at the Little River facility for IRF therapy due to peripheral vascular disease and bypass surgery. By September 16, Patient 12 was already ambulating three hundred (300) feet and was considered supervision with Activities of Daily Living.  By September 17, Patient 12 ambulated four hundred fifty (450) feet and was modified independent with Activities of Daily Living, and, by this time, Patient 12 should have been discharged to home.  Patient 12's medical documentation indicated the patient was at a high-level of function and remained that way for several days before discharge, and therefore, was no longer considered eligible or within the criteria for IRF according to Government Payors' conditions of payment. Instead of discharging the patient, however, Defendants kept Patient 12 for another eight (8) days to "complete" her stay, and Defendants continued to fraudulently receive reimbursement from Government Payors for the remainder of Patient 12's IRF stay until she was finally discharged on September 25, 2019, as directed by the Case Manager.

167.    Similarly, Patient 13, a Medicare beneficiary, was already independent in her PAS form, but was approved for IRF admission by Dr. Tarbert-Smaldone and admitted on November

30, 2019. Dr. Tarbert-Smaldone's Nurse Practitioner, Mary Harding, recorded in her note that Patient 13 did four (4) flights of stairs and walked around the entire building with IRF therapy. Dr. Tarbert-Smaldone was told that Patient 13 should be discharged, but the patient remained in IRF until her discharge on December 5, 2019, to maximize reimbursement from Government Payors.

168.    These are a few representative examples of the Defendants fraudulently admitting patients that are already high-level independent and/or increasing their lengths of stay and failing to discharge patients at the appropriate time in order to receive additional reimbursement from Government Payors.

### D.    False Re-Admissions or "Second Chance" Admissions

169.    Defendants routinely re-admit Government Payor patients for another IRF therapy stay within a few months of a prior IRF stay for the same or similar diagnosis, such as transferring these patients to be admitted at another IRF facility operated by Defendants, when the patients would not be eligible for additional IRF therapy, and, therefore, Defendants should not receive reimbursement from Government Payors for same.

170.    These false "second chance" admissions result in Government Payors making substantial payments to Defendants, especially for conditions known to have recurrent episodes, such as patients with Chronic Obstructive Pulmonary Disease/Congestive Heart Failure.

171.    For example, Patient 12, a Medicare beneficiary, was admitted on September 13, 2019, at the Little River facility for IRF therapy due to peripheral vascular disease and bypass surgery, and she was ready and able to be discharged by September 17, 2019, due to her high level of function at that time. However, Defendants did not discharge Patient 12 until September 25, 2019. Shortly thereafter, from December 20 to December 29, 2019, Patient 12, completed another IRF stay at the Little River facility for this same diagnosis. A few months later, from February 11

to February 24, 2020, Patient 12 completed a third IRF stay at the Little River facility for this same diagnosis.

172.     Another example includes Patient 14, a Medicare beneficiary, who was admitted on two separate occasions for the same diagnosis of "brain injury" from a remote event in 2018. Patient 14's first admission was at the Little River facility from August 16 to August 30, 2019, after she suffered a hip fracture. Patient 14's second admission at the Little River facility was approved by Dr. Tarbert-Smaldone from December 19, 2019, to January 2, 2020, for a urinary tract infection. Government Payors (Medicare) reimbursed Defendants for the second admission which was false and fraudulent because the patient has a known history of Dementia which was baseline for her and clearly had a non-CMS-13 compliant diagnosis, which did not require IRF therapy.

173.     Similarly, Patient 15, a Medicare beneficiary and amputee, was admitted three (3) times over a span between May 2019 to April 2020. Patient 15 was first admitted at the Murrells Inlet facility and then spent the last two admissions at the Little River facility, all for the same related diagnosis of lower limb amputation.

174.     On information and belief, Patient 16, who was admitted on February 29, 2020, had previously completed IRF therapy at one of Defendant Encompass Health's facilities in Florence, South Carolina, and was then moved to the Little River facility one-to-two months later for additional IRF therapy for the same diagnosis.

E.     **Inappropriate and Unnecessary Consultations During IRF**

175.     Defendants also bill for inappropriate and unnecessary consultations during the patients' IRF therapy stays, such as physicians in the same specialty "consulting" one another over a chronic condition and then being paid for these "consults" solely to increase the overall

reimbursement from Government Payors.

176.     During appropriate IRF therapy stays, Physical Medicine and Rehabilitation physicians (also known as "Physiatrists") may consult other physicians, such as, Internal Medicine physicians (also known as "Internists"), for medically necessary consultations when there is a significant change in the patients' condition, such as renal failure, hypoxemia, fever, severe hypertension/hypotension, uncontrolled blood sugar, blood clots, and so forth, that merits a legitimate consultation with the physician-specialist's expertise or opinion, and Government Payors will reimburse IRF facilities for said consultations deemed clinically necessary.

177.     However, the Defendants routinely submit claims and receive reimbursement from Government Payors for "consultations" between the Medical Director, Dr. Tarbert-Smaldone, who is an Internist, and one of the other Internists that she employs in her private medical practice, such as Drs. King, Parish, and/or Thiyagarajan. These "consultations" are automatically conducted without any clinical necessity, often on the same day of patients' IRF admission, and the content of the consultation is for chronic conditions, such as hypertension and similar conditions, that do not justify an Internist to "consult" another Internist from the same practice group and with the same specialty. These Internists' clinical notes often nearly identical, mirroring each other, due to these physicians using the same templates created and used by Dr. Tarbert-Smaldone for her group.

178.     For example, on May 6, 2020, <u>Patient 10</u> was approved for IRF therapy by Dr. Tarbert-Smaldone, and then Patient 10 was admitted on May 7, 2020, under the service of Dr. Thiyagarajan. Patient 10 was also seen by Nurse Practitioner, Jessica Iono, on behalf of Dr. Tarbert-Smaldone who assumed the role of the "Rehabilitation" physician. Dr. Thiyagarajan "consulted" Dr. King, who saw Patient 10 on May 8, 2020, when both of these physicians are considered to be Internal Medicine. Patient 10's daily progress notes for Dr. King and

Dr. Thiyagarajan, from May 11 to May 13, 2020, also show that both of these Internal Medicine physicians are credited for seeing Patient 10 via the unnecessary "consultations" on the same dates. As a result, there were effectively three (3) different Internal Medicine physicians who saw Patient 10, Dr. King and Dr. Thiyagarajan, as well as Dr. Tarbert-Smaldone through her Nurse Practitioner, Jessica Iono. Patient 10's Pre-Admission Screening ("PAS") form had a primary diagnosis is cellulitis of the arm, but the Nurse Liaison, Joan Donnegan, put Patient 10 in the category of "NEUROLOGICAL CONDITIONS" under the section "Primary Acute Care Diagnosis." In fact, on May 11, 2020, Patient 10 complained about his care, stating that "he was duped into coming to rehab by a doctor" and demanded to be discharged home as soon as possible. Patient 10 was eventually discharged on May 14, 2020. On information and belief, Defendants thereafter fraudulently billed and received reimbursement from the Government Payor (Medicare) for these various unnecessary "consults" on behalf of Patient 10.

179.    As another example, <u>Patient 17</u>, a Medicare beneficiary, was admitted on May 1, 2020, by Dr. Marlo Bruno, who is an Internist/Rehabilitation physician employed by Dr. Tarbert-Smaldone. Patient 17 was seen by Dr. Tarbert-Smaldone's Nurse Practitioner, Jessica Iono, on May 2, 2020 for an Internal Medicine consultation, with Dr. Tarbert-Smaldone as the consulting M.D. Dr. Bruno's admission notes were almost identical to the consultation notes of the Nurse Practitioner, Jessica Iono, aside from the Post-Admission Physician Evaluation that is required in Dr. Bruno's admission notes to differentiate it as the admitting Rehabilitation physician's documentation.

180.    At all times material hereto, Dr. Tarbert-Smaldone oversaw the both locations of Defendant Tidelands Health, and she had two Internal Medicine physicians seeing the same patients on the same days for which she was billing on behalf of herself, thereby allowing

Defendants to engage in the fraudulent and unnecessary consultations.

181.    At all times material hereto, Dr. King is an Internist/Hospitalist, and Dr. Thiyagarajan is also an Internist, and both are employed by Dr. Tarbert-Smaldone in her private medical practice.

182.    Dr. Tarbert-Smaldone is also known to bill for the services of Dr. Parish, who is a locums physician that is supposed to work in her place, but in fact, Dr. Tarbert-Smaldone sees patients at the Little River location, while Dr. Parish is at the Murrells Inlet location. Dr. Tarbert-Smaldone admits patients as a "rehabilitation physician" (when she is actually an Internist), and then she "consults" another Internist like Dr. Parish for the same patient. Likewise, once Defendants deemed Dr. Parish as a "rehabilitation physician" in turn, Dr. Parish would then "consult" Dr. Tarbert-Smaldone, and Dr. Tarbert-Smaldone would typically send one of her Nurse Practitioners, such as Mary Harding, to see patients on her behalf as the "consult" with the other Internists. In effect, Dr. Tarbert-Smaldone, an Internist, automatically "consults" another Internist, Dr. Parish, that she has hired and Dr. Parish will also do the same "consult" with another Internist, such as Dr. Tarbert-Smaldone or Dr. King, to do the same task.

183.    Moreover, once Dr. Tarbert-Smaldone "consults" with one of her Internal Medicine physicians, the consulting physicians will continue to follow-up and see these same patients on a near daily basis, thereby substantially increasing Defendants' overall reimbursement that is paid by Government Payors for the IRF services.

184.    On information and belief, Dr. Tarbert-Smaldone engages in these unnecessary consultations with the Internal Medicine physicians because the physicians are paid a fee/salary by Dr. Tarbert-Smaldone's private medical practice, and the only way she can continue to maintain her private medical practice is by generating substantial revenue, such as billing for the IRF

services that were provided by "consulting" physicians employed by her. Without the additional revenues generated for these "consultations," Dr. Tarbert-Smaldone's private medical practice would then have to dip into her own pocket to pay for her physicians' salaries.

185.    Thus, there is an inherent conflict in Defendants' arrangement with Dr. Tarbert-Smaldone and her private medical practice to furnish the physicians at the Tidelands Health locations because—in addition to Dr. Tarbert-Smaldone having complete discretion to control and instruct her own physicians as she sees fit, including her directing them to admit patients with false CMS-13 diagnosis, which clearly benefits Defendants' financially—Dr. Tarbert-Smaldone also has the authority to hold these "consults" with her own physicians in the same specialty, thereby increasing the overall reimbursement to Defendants as well as to Dr. Tarbert-Smaldone and/or her private practice.

186.    Effectively, Defendants and Dr. Tarbert-Smaldone are able to pay themselves with these fraudulent "consults" throughout the patients' IRF stays with the money funded by Government Payors, like Medicare, at the expense of taxpayers.

187.    During the time Dr. Tarbert-Smaldone was running either of Defendant Tidelands Health's locations, from January 2019, forward, she effectively assumed two roles:  One as a "rehabilitation doctor" where she billed three (3) times a week, but then also had one of her Nurse Practitioners, Mary Harding, Lindsey Jernigan, and Jessica Iono, that worked for her, see the same patients and were billed as a "consulting" Nurse Practitioner, which was unnecessary and essentially a form of fraudulent double billing. Throughout this time, Dr. King was also "consulted" for Dr. Tarbert-Smaldone's patients, resulting in Defendants billing for the same patients that Dr. Tarbert-Smaldone and Dr. King both saw. Dr. Tarbert-Smaldone did the same double billing scheme when Dr. Parish saw her patients at the Murrells Inlet facility from 2019, forward, as well

as bill for the patients that her Nurse Practitioners saw as the Internal Medicine "consult." Dr. Parish covered the Murrells Inlet location (on behalf of Dr. Tarbert-Smaldone), while Dr. Tarbert-Smaldone also ordered her Nurse Practitioners to cover the same patients as Dr. Parish, and Defendants then billed for the Internal Medicine "consults" provided by both Dr. Parish and the Nurse Practitioners for those same patients.

188.    One of the primary reasons Defendants are able to justify this billing scheme is because, while Dr. Tarbert-Smaldone is an Internal Medicine specialty, physicians like her who are non-Physiatry trained, can be "certified" by a facility to become a "rehabilitation physician."

189.    To become certified, Dr. Tarbert-Smaldone and others, including Dr. Parish, obtained Continuing Medical Education ("CME") credits and received supervision training from a Physical Medicine and Rehabilitation ("PMR") physician. Defendants thereafter "certified" them as "rehabilitation physicians." (*See infra*, Section VII.H regarding Defendants hiring non-rehabilitation physicians).

190.    As a result, Dr. Tarbert-Smaldone is able to admit patients for IRF therapy into her own service as the "rehabilitation" physician, and then unnecessarily "consults" another Internal Medicine physician, like Dr. King, who works for her, and Defendants submit these "consults" to Government Payors for reimbursement. However, this would be considered fraudulent because such "consults" was not necessary or justifiable, especially since Drs. King, Tarbert-Smaldone, Parish, Bruno, and Thiyagarajan, all have the same specialty of Internal Medicine.

191.    After Dr. Parish also became "certified" as a "rehabilitation physician" to admit patients at the Little River facility in or around January 2020, Dr. Parish thereafter began "consulting" Dr. Tarbert-Smaldone for Internal Medicine, just as Dr. Tarbert-Smaldone previously "consulted" Dr. Parish for Internal Medicine. The physicians simply switched roles in performing

these "consults" for Internal Medicine vs. "rehabilitation" physicians.

**F.     Motive to Engage in the Fraudulent Conduct: Quotas and Cash Bonuses**

192.    Defendants' employees are trained and financially incentivized to admit patients in the IRFs with certain quotas required by Defendants, and which result in cash bonuses.

193.    Specifically, the Admissions personnel (*i.e.*, Nurses/Admissions Liaisons), who are responsible for filling out the Pre-Admission Screening ("PAS") forms and often insert leading statements therein to assist the attesting physician with rubber-stamping the IRF admission, are the only employees held to assigned quotas for the number of patients admitted. In turn, when the quotas are met, Admissions personnel are paid cash bonuses.

194.    It is no coincidence that the same Admissions personnel who are held to these quotas and, in turn, receive bonuses—and are therefore highly motivated to admit each and every patient for IRF services—are also empowered by Defendants at all stages of the IRF admissions process to get patients admitted, such as by allowing the Admissions/Nurse Liaisons to create and fill out the PAS forms and, further, approve the admission even before a physician signs off on the PAS, thereby rendering them the *de facto* decision-makers over patients' IRF admission.

195.    In 2019, forward, it was widely acknowledged by the Chief Nursing Officer ("CNO"), Linda Gilhuly, and Nurse Liaisons, such as Jennifer Droppleman (former Director of Business Development/Marketing), Corey Anderson, and Mike McKinley, that the Admissions Liaison personnel are incentivized as a group with bonuses once they meet certain admission quotas.

196.    Nurse Liaison at Aiken Regional Hospital, Delori Brown, who previously worked at one of Defendant Encompass Health's facilities in Augusta, GA, also confirmed that the Admission Liaisons are incentivized as a group and the details of these incentivizes are set forth

in their contracts with Defendants, and that they are given "cash bonuses" based on the number of strokes, spinal cords, and brain injury patients that are admitted for IRF. Brown indicated that many times she objected to fraudulent admissions of inappropriate patients and refused to give into the demands of her supervisors. Brown further stated that CEOs of Defendants' IRF facilities force physicians to admit patients for IRF, or if a physician refuses to approve one patient for IRF, then the CEOs would seek another physician to change the decision. Brown also confirmed that these fraudulent practices are systemic throughout the other IRF facilities owned and/or operated by Defendants.

197.    The Nurse Liaisons, such as Delori Brown, have also affirmed that they are required to have a certain number of face-to-face interactions with physicians and are tasked to ensure that every referral documentation is completed and approved by physicians within two (2) hours of receipt of a referral. These high-pressure tactics ensure that there is a constant flow of patients coming into the IRFs, and also the number of referrals and how quickly they are confirmed for admission are closely tracked in Defendants' system.

198.    The Admissions/Nurse Liaisons are required and financially incentivized to seek patient referrals from any and all sources and to also encourage the physicians to send their patients to the Defendants' facilities for IRF therapy, regardless of the patients' health status or condition.

199.    In turn, Defendants receive patient referrals from a variety of sources to meet these required quotas, including hospitals, physician offices, skilled nursing facilities, assisted living facilities, outpatient therapy clinics, and even home health agencies.

200.    One of the most prominent home admission patient referral sources for Defendant Tidelands Health is a home health agency, referred to as "Liberty Home" by Defendants' employees, which is believed to be Liberty HomeCare & Hospice, LLC, d/b/a Liberty Homecare

Group, LLC (NPI No.: 1851353486) with a primary practice address at 1307 E. Pine Log Road, Suite B, Aiken, South Carolina, 29803.

201.    In addition to Liberty Home, other prominent home admission patient referral sources for Defendants also includes home health agencies Medical Services of America, Inc. ("MSA"), and Amedisys Home Health in Conway which is believed to be Amedisys Home Health of South Carolina, LLC.

202.    From 2019, forward, several of Defendants' IRF patients were either receiving, or had received, home health services from one of these entities, and then their patients were subsequently referred to Defendants and admitted for IRF therapy.

203.    Dr. Tarbert-Smaldone also refers patients for IRF therapy at Defendants' facilities through her work at regional nursing homes and/or assisted living facilities, and/or through her own private medical practice, such as through her own company, believed to be Advanced Disease Physicians, Inc., with the primary taxonomy of Assisted Living Facility under Dr. Tarbert-Smaldone's South Carolina License Number (No. 26891).

204.    For example, on or about May 1, 2020, Dr. Tarbert-Smaldone stated during Patient 1's History and Physical Examination that she knew Patient 1 from one of her other facilities, and Defendants continue this self-referral practice, including with potential kickbacks, through the date of this filed Complaint.

G.    **Corporate Training**

205.    Defendant Encompass Health utilizes strict top-down training to essentially coach its various IRF facilities and employees on how to justify patient IRF admissions and discharges to Government Payors like Medicare.

206.    This training consists of various pamphlets, brochures, PowerPoint presentations,

face-to-face "coachings," as well as the overall monitoring and pressure put on the IRF facilities to ensure their profitability.

207.    Defendants routinely target certain non-CMS-13 diagnoses to justify patients being admitted for IRF, most often, using a false diagnosis either "disuse myopathy" or "critical illness myopathy."

208.    In May 2019, while at Little River facility, Relator was approached by a female hospital staff member about adding "myopathy" to one of Relator's first admissions, Patient 5, and Relator was then given a handout of a PowerPoint presentation about how to diagnosis "myopathy." Relator refused to add the diagnosis of myopathy because there was no clinical evidence supporting such a diagnosis for Patient 5. However, this PowerPoint presentation, which was created by the National Director of Health Information Management Systems, Melanie Frazey, was essentially tips for the physicians on converting a non-CMS-13 diagnosis to a CMS-13 compliant diagnosis. This PowerPoint was created to "train" Defendants' staff on characterizing patients' conditions to justify IRF admissions because it focuses on CMS-13 diagnoses like metabolic encephalopathy, acute care vs. possible rehab diagnoses, and it shows how Defendants target certain non-CMS-13 diagnoses for conversion to CMS-13 diagnoses to justify IRF admissions.

209.    Further, Defendants' Admissions personnel/Nurse Liaisons, utilized another PowerPoint presentation entitled, "Making the Case for Admission – Medical Management – The Bridge Between Complexity and Benefit," dated January 27, 2017, that was created by Defendants' Regional Director of Managed Care, Stacy Johnson to "help with" the Pre-Admission Screening ("PAS") forms to justify IRF admissions. This PowerPoint is essentially a guideline for the Admissions personnel/Nurse Liaisons to assist them with coming up with the proper verbiage in

the PAS forms to justify IRF admission, as they are trained and instructed to insert leading statements in the PAS forms that they create to influence the diagnoses and justify IRF admission.

210.    For example, on or about September 25, 2019, <u>Patient 18</u>, a Medicare beneficiary, with a wrist fracture, was referred to Defendants for IRF therapy by home health agency, Medical Services of America, Inc. Nurse Liaison, Colleen Walz, created Patient 18's PAS form and effectively suggested that Patient 18 should be diagnosed with "myopathy" to justify her IRF admission. Yet, Patient 18 only had a wrist fracture, which is not a qualifying CMS-13 diagnosis to justify IRF admission. In fact, Nurse Liaison, Walz, presented Patient 18's case and later commented in the PAS form that she was not a candidate because of a non-CMS-13 compliant diagnosis and only received one (1) day of home therapy. Then, on September 26, 2019, despite Patient 18 being previously rejected for IRF therapy, Nurse Liaison, Walz advised that Patient 18 had been approved for IRF admission. Walz stated that the Director of Business Development/Marketing at the time, Jennifer Droppleman, instructed Walz to process Patient 18, and circumvent the process by directly requesting approval and obtaining pre-authorized approval from the Government Payor, all of which was without physician approval. The physician's original comments in the PAS form explaining why Patient 18 was not eligible for IRF therapy, due to lack of "medical necessity" and "non-complying CMS diagnosis" for a wrist fracture, were actually deleted (or "scrubbed") from the PAS. Patient 18 was then admitted at the Little River location for IRF therapy with a diagnosis of wrist fracture, from September 27, 2020 to October 9, 2020.

211.    As set forth above, Defendants' management instruct and pressure the nurses and therapists, to make the "patients look sicker than they are" and reflect a higher acuity in the IRF Patient Assessment Instruments. In particular, at Defendant Tidelands Health, the Director of Quality/Risk, Christy Lachapelle, will inform the nurses if they did not "rate properly" in their

initial assessments, because the nurses are expected to artificially lower the patients' scores, such as in the motor and/or functional independence, on the IRF Patient Assessment Instrument forms which are then submitted to CMS for purposes of reimbursement. By scoring the patients lower in these areas, this creates an impression that the patients are more impaired, increasing complexity, a higher tier, and/or must be kept longer than necessary in length of stay, therefore allowing Defendants to receive a higher reimbursement from Government Payors. Similarly, at discharge, the therapists and nurses are likewise expected and trained to show "improvement" and a better outcome for the patients in those same scores that were artificially lowered at admission, in order to make Defendants' facilities appear as if the IRF therapy was successful.

212.   For example, during the weekend of March 1, 2020, at the Murrells Inlet location, one of the nurses explained the Defendants' expectations in terms of completing the assessments in order to make the patients appear sicker at admission: "make the patient look as bad as you can get away with when they get here" and also make those same patients appear improved at discharge: "as good as you can get away with when they leave."

213.   Defendants further train employees to target for IRF admission the patients receiving home health care, particularly those in outpatient clinics that serve as "neurological" cases and/or those on dialysis, since such cases result in higher reimbursement from Government Payors.

214.   In relevant part, the point of home health care is to provide therapy services to patients who are considered to be "homebound," *i.e.*, unable to leave their homes without substantial assistance, but also are well enough to not require any hospitalization nor IRF therapy to a hospital-based rehabilitation facility like one of Defendants' facilities. Admitting patients for IRF therapy from home usually means that these patients are quite sick and medically require

hospitalization, but primarily require rehabilitation therapies rather than intensive medical workup or care in an acute hospital. In most instances, the patients admitted to the Defendants' IRF facilities are stable and do not require acute hospitalization, but are nevertheless targeted because they have a particular diagnosis (such as, end-stage renal disease with hemodialysis) that results in a much higher tier for reimbursement from Government Payors. Therefore, it is highly unlikely that a home health patient would need to be admitted to an IRF for rehab services and, as such, the home health patient admissions have to be closely scrutinized to justify IRF admission in accordance with Government Payor criteria.

215.    However, Defendants train their employees to target and admit home health patients for IRF therapy. For example, the Nurse Liaisons and Admissions personnel are provided documents to train them how to target patients who are already at home.

216.    On October 3, 2019, the CEO, Carey Swanson, stated that about five-to-ten percent (5-10%) of Defendant Tidelands Health's patients are home health admissions, but Swanson indicated that their "target goal" was to increase the direct from home admissions to as much as twenty percent (20%). In fact, during this same meeting, Swanson reported that one of Defendant Encompass Health's facilities in Charleston, South Carolina, has about twenty percent (20%) of their admissions coming from home health.

217.    As set forth above, Defendants receive a significant number of patient referrals from certain home health agencies, such as Liberty Home, Medical Services of America, Inc., and Amedisys Home Health in Conway which is believed to be Amedisys Home Health of South Carolina, LLC. (*See supra*, at Section VII.F).

**H.     Utilizing Non-Rehabilitation Physicians in the Fraud**

218.    Defendants hire and retain physicians who will go along with the fraudulent

schemes, such as, by rubber-stamping patients' IRF admissions. To do this, Defendants make a point to aggressively recruit and hire physicians who are nominally trained in the field of Rehabilitation Medicine, such as Internal Medicine physicians, and then effectively rebadge these physicians as "rehabilitation specialists" and/or "rehabilitation physicians" to give the appearance that they are familiar with IRF therapy and the Government Payor criteria for IRF eligibility, when, in fact, they are not.

219.    Due to their lack of training, the rebadged "rehabilitation physicians" are much easier to convince to admit patients for IRF therapy because they will often defer to the Admissions personnel/Nurse Liaisons' judgement on the PAS forms to admit patients.

220.    These non-Rehabilitation Medicine physicians are recruited and then assigned medical directorship positions at one of Defendants' locations, paid a monthly stipend, and are reclassified as "rehabilitation physicians" once they complete a short period of mentorship in the position.

221.    For example, Defendant Tidelands Health's Medical Director, Dr. Tarbert-Smaldone, as well as Dr. Parish, are both Internists, but after earning a few Continuing Medical Educations credits and being supervised by a Rehabilitation Physical Medicine and Rehabilitation physician, Defendants re-designated them as "rehabilitation physicians."

222.    The vast majority, if not all, of the non-Physical Medicine and Rehabilitation physicians at Defendant Tidelands Health's locations, are actually Internal Medicine physicians, including Drs. Tarbert-Smaldone, Marlo Bruno, and Evelyn Parish, and are also employed directly by Dr. Tarbert-Smaldone's private medical practice, which is believed to be Advanced Diseases Physicians, Inc., of which Dr. Tarbert-Smaldone is its CEO.

223.    In reality, the Internal Medicine physicians employed by Dr. Tarbert-Smaldone's

private medical practice, including those listed in the above paragraph, have little-to-no experience or intensive training as Physical Medicine and Rehabilitation physicians that Physiatrists are uniquely qualified for, but are nevertheless instrumental in carrying out Defendants' fraudulent schemes, as set forth herein, because they subscribe to Defendants' fraudulent practices, for example, of admitting patients for IRF therapy with false diagnosis, at the instruction of their employer, Dr. Tarbert-Smaldone, and also allow the Internal Medicine physicians to engage in the unnecessary and fraudulent "consults" with the other Internal Medicine physicians (as set forth *supra* at Section VII.E).

I.     **Additional Representative False Claims Submitted to Government Payors**

224.     In addition to the false and fraudulent IRF admissions (at Exhibit 1), the following are additional claims that were submitted by Defendants in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq*. Given the breadth and scope of the fraud, these patient cases are only representative examples of the Defendants' fraudulent conduct, as alleged herein, are by no means exhaustive, and are all Government Payor beneficiaries, primarily Medicare, to-wit:

225.     On April 23, 2020, at the Little River facility, Patient 19, with Alzheimer's Dementia, presented with confusion from dehydration. Defendants falsely classified this patient as a Non-traumatic Brain Injury IGC/CMG 02.1 C0302 (C0302 is the tier group C which determines the level of complexity and subsequent payment), such as "Acute Metabolic Encephalopathy," resulting in Government Payors falsely reimbursing Defendants.

226.     On October 22, 2019, at the Little River facility, Patient 20 had back pain and was admitted from home. Defendants falsely classified this patient as a spinal cord injury under the IGC/CMG 04.130 D0501 (D0501 is the tier group D which determines the level of complexity and subsequent payment) resulting in Government Payors falsely reimbursing Defendants.

227.     On January 9, 2020, at the Little River facility, <u>Patient 21</u> presented with a fall and T12 endplate fracture, and complaints of back pain, but had essentially a normal motor exam. Defendants falsely classified this patient as a traumatic spinal cord injury under IGC/CMG 04.230 D0402 (IGC 04.230 signifies "other traumatic spinal cord dysfunction"). Patient 21 also received a diagnosis of "Critical Illness Myopathy" resulting in Government Payors falsely reimbursing Defendants.

228.     On January 24, 2020, at the Little River facility, <u>Patient 22</u>, who was diagnosed with congestive heart failure and Pneumonia when he was admitted to an acute hospital, and should have been admitted for IRF with a Pulmonary CMG 1501 which has a lower reimbursement rating. However, Defendants falsely upcoded this patient under IGC/CMG 03.8 D0602 which allowed Defendants to claim a CMS-13 compliant diagnosis, and also resulted in a substantial increase in reimbursement by Government Payors.

229.     On December 20, 2019, at the Little River facility, <u>Patient 23</u> presented with a urinary tract infection, which is non-CMS-13 compliant and does not justify IRF therapy under Government Payor criteria.  However, Defendants falsely diagnosed this patient with critical illness myopathy under IGC/CMG 0.38 A0603, to make the patient's diagnosis CMS-13 compliant. This false diagnosis justified Patient 23's IRF admission, allowed Defendants to skirt the sixty percent (60%) compliance threshold rule, and also significantly increased reimbursement from Government Payors that Defendants otherwise would not have been paid.

230.     At the Murrells Inlet facility, Dr. Tarbert-Smaldone admitted two (2) Medicare patients for IRF therapy that she diagnosed with "critical illness myopathy," without any clinical evidence to justify the diagnosis. The first patient was <u>Patient 24</u>, who was morbidly obese and was hospitalized at an acute hospital from September 19 to September 25, 2019, and intubated for

three (3) days from September 19 to September 21, 2019, for acute on chronic hypoxia. Despite no evidence of having critical illness myopathy, Patient 24 was admitted with this CMS-13 diagnosis at the Murrells Inlet facility on September 25, 2019, until discharge on October 7, 2019.

231.     The second patient admitted by Dr. Tarbert-Smaldone at the Murrells Inlet facility was Patient 25, ninety (90) years old, and was hospitalized from September 27, 2019 to October 4, 2019, for bacteremia and atrial fibrillation, with no clinical evidence of having critical illness myopathy. But Defendants nevertheless admitted Patient 25 with this CMS-13 diagnosis to the Murrells Inlet facility on September 27, 2019.

232.     Based on the representative examples of fraudulent patient encounters identified herein, as well as in Exhibit 1 attached hereto, Defendants receive at least $1,000,000 per year in fraudulent reimbursements from Government Payors for the Tidelands Health locations alone.

### J.     Wrongful Terminations & Retaliation Against Employees

233.     Defendant Tidelands Health has a very high staff turnover, as much as 28.29%, according to the CEO, Carey Swanson, in January 2020. This is due to Defendants' overall culture of emphasizing profits at the expense of patient care, and this culture also causes issues among the medical providers and the administration.

234.     For example, on September 8, 2019, Defendants' leadership, including the CEO, Carey Swanson, received a letter from one of the nurses, Charge Nurse, Amanda (last name believed to be Goist), regarding numerous issues that a group of nurses was experiencing.  For example, the nursing staff are promised a patient load of five (5) to six (6) cases, but end up being assigned as many as eight (8) or more patients once they begin working at the IRF facilities. On several occasions, nurses complained that they were carrying nine (9) to ten (10) patients and feared that they cannot provide the care that their patients needed. After these concerns were raised

to the CEO and leadership, however, they made light of the situation, dismissed the complaints, and the Charge Nurse, Amanda, who presented the letter to leadership on behalf of the nurses, was thereafter humiliated by management until she eventually resigned.

235.    In May 2020, one of Defendants' locums physicians, Dr. Scott Krupkin advised the Relator that he shared similar experiences as the Relator regarding Defendants' admitting inappropriate patients when Dr. Krupkin worked at Defendants' facility in west Tennessee. Dr. Krupkin stated that he declined to admit a patient for IRF, who was presented to him by a Nurse Liaison, as the patient was a hospice candidate because of disseminated cancer. Dr. Krupkin attempted to convey his concerns to the CEO of the facility, but the same Nurse Liaison was already in the CEO's office. Dr. Krupkin told them that his role is to protect the facility from admitting inappropriate patients and prevent fraud, and that he cannot in good conscience admit a patient and, if that is their wish, he would rather leave. This confrontation resulted in Dr. Krupkin being effectively blacklisted from working again in another Encompass Health facility.

236.    Defendants have retaliated against other employees for raising objections to the fraudulent conduct, including, on March 17, 2020, one of the physical therapists at the Little River facility advised that she was fired and escorted out of the facility because she "was very vocal about the things that were not right or appropriate at the hospital."

237.    Due to Relator's persistent objections and refusal to engage in the fraudulent conduct, on September 20, 2019, the CEO, Carey Swanson, provided Relator with a ninety (90) days' notice that his contract with Defendants was being terminated and that he was being removed as the Associate Medical Director, effective December 19, 2019. This was considered a substantial demotion in retaliation for Relator's attempts to stop the fraudulent submission of claims to Government Payors in violation of FCA, thereby also violating the FCA's anti-retaliation

provision, 31 U.S.C. § 3730(h).

238.    After December 19, 2019, the Relator continued to work as a staff Physiatrist, but in a diminished role with less compensation, as Relator was excluded from leadership meetings and the ability to review the PAS forms to admit or reject patients for IRF.

239.    The Relator eventually was left with no choice but to terminate his contract with Defendants on May 11, 2020, because of his diminished role and responsibilities, reduced patient load, decreased compensation, as well as his overall declined health caused by the work environment, including severe stress that resulted in episodes of elevated blood pressure that did not respond to medications. Relator also did not want to be a part of an organization that institutionalizes fraud and enforces silence, and further risk his medical license if he was somehow implicated in the fraud.

240.    Even after Relator stopped working for Defendants, Defendants continued to retaliate against Relator for his objections and refusal to participate in the fraudulent conduct during his tenure. For example, on November 2, 2020, Relator lost an assignment with the Midlands Regional Rehabilitation Hospital, much to his financial detriment, due to Defendants' refusal to respond to requests from the hospital for information to verify Relator's tenure, and also due to the Medical Director, Dr. Tarbert-Smaldone, providing a negative reference for the Relator. Defendants' retaliatory conduct after Relator's termination is also in violation of the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h), and further constitutes tortious interference with Relator's employment and economic interests.

### K.    Relator's Prior Disclosures to the Government

241.    After the Relator became further aware of the fraudulent conduct described herein, on February 22, 2020, Relator reported the fraudulent conduct described herein to Catherine Perez,

at the Center for Clinical Standards and Quality, CMS, Survey & Operations Group, Northeast Survey & Enforcement Division.

242.    At the request of Catherine Perez, on March 2, 2020, Relator provided additional details regarding what Relator believed CMS and/or OIG needed to investigate with respect to Defendants' fraudulent conduct, and Relator thereafter provided further details regarding the fraudulent conduct described herein to an OIG Special Agent on at least three (3) separate occasions.

243.    Therefore, the Relator is also an original source of the information that he previously provided to the Government, before the filing of this Complaint and pre-filing disclosure, within the meaning of the False Claims Act, 31 U.S.C. § 3730(e).

## VIII.    SPECIFIC COUNTS AND RELIEF SOUGHT

244.    The United States was damaged as a result of the conduct of Defendants by submitting or causing to be submitted false or fraudulent claims, statements, and records and claims for payment as described in Relator's Complaint.  Defendants profited unlawfully from the payment and retention of reimbursements to which Defendants were not legally entitled.

### COUNTS 1 – 4
### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729 *et seq*.

245.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

246.    As set forth above, from at least January 2019 through the present, Defendants presented false or fraudulent claims for payment, or knowingly caused false or fraudulent claims for payment to be presented to officials of the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

247.    As set forth above, from at least January 2019 through the present, Defendants knowingly made, used, or caused to be made or used, false records or statements material to the false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

248.    As set forth above, from at least January 2019 through the present, Defendants conspire to defraud the United States by getting false or fraudulent claims allowed or paid by the United States, to commit a violation of 31 U.S.C. § 3729 (a)(1)(A), (B), & (G), all of which is in violation of 31 U.S.C. § 3729(a)(1)(C).

249.    As set forth above, from at least January 2019 through the present, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States pursuant to 31 U.S.C. § 3729(a)(l)(G).

250.    As set forth above, Defendants wrongfully received overpayment from Government Payors for millions of dollars and purposely withheld it knowing it was wrongly received. The Affordable Care Act requires a person who has received an overpayment of Medicare or Medicaid to report and return the overpayment within sixty (60) days of identification or the date any corresponding cost report is due, and failure to report and return the overpayment is an obligation for the purposes of the False Claims Act under 31 U.S.C. § 3729(a)(l)(G). *See* 42 U.S.C. § 1320a- 7k(d).

251.    The United States paid Defendants for their false and/or fraudulent claims, and Defendants' misrepresentations were material to the United States' payment decision. Had the United States known the claims were false, the Defendants would not have been paid for the claims.

252.    By virtue of the false or fraudulent claims submitted or caused to be submitted by

Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

### COUNT 5
### RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3730(h)

253.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

254.    As set forth above, Defendants harassed and discriminated against Relator in the terms and conditions of his employment contract because of lawful acts done by him and other efforts to stop one (1) or more violations of the Federal False Claims Act, and/or due to Relator's refusals to participate in the fraudulent conduct and his complaints about the fraudulent conduct, and the Defendants' failure to correct it. Relator was ultimately demoted and removed as the Associate Medical Director for a trumped-up reason on December 19, 2019, and was thereafter left with no choice but to terminate his contract on May 11, 2020, all of which was to his financial detriment, emotional distress, humiliation, and embarrassment.

255.    Further, after Relator's termination, Defendants continued to engage in illegal retaliation against Relator for his protected activities during his tenure, including providing a negative reference for Relator, and also the refusal to respond to request for Relator's tenure verification ultimately costing the Relator another work assignment after he stopped working for Defendants, much to his financial detriment, emotional distress, humiliation, and embarrassment.

256.    Defendants' conduct is in violation of 31 U.S.C. § 3730(h), and, as a result of Defendants' wrongful actions, Relator has sustained and will continue to sustain loss of income and benefits, humiliation and embarrassment, and emotional distress, in such an amount to be

determined at trial.

257.    Pursuant to 31 U.S.C. § 3730(h), Relator is entitled to compensatory and special damages, including back pay and front pay (or, in the alternative reinstatement if the Court deems it appropriate), two (2) times the amount of backpay with interest, punitive damages, prejudgment interest, litigation costs, reasonable attorneys' fees, a jury to try this cause, and other injunctive relief as deemed appropriate by the Court.

## IX.    PRAYER FOR RELIEF

258.    WHEREFORE, the Relator demands on behalf of the United States, judgment in its favor against Defendants as follows:

259.    On Count 1 through Count 4 under the Federal False Claims Act, for the amount of the United States' damages, multiplied by three as required by law, and such civil penalties as are permitted or required by law; the maximum share amount allowed pursuant to 31 U.S.C. § 3730(d); all costs and expenses of this action, including attorney fees, expenses and costs as permitted by 31 U.S.C. § 3730(d); and all such other relief as may be just and proper, including for the Court to declare a resulting trust and/or constructive trust on all assets acquired by Defendants' unjust enrichment of money that should have been refunded to the United States, and/or for an accounting of all revenues unlawfully obtained or retained by Defendants and for the disgorgement of such funds, together with further equitable relief as may be just and proper; for common law fraud and conversion, and for a jury to try this cause.

260.    On Count 5 for Relator's retaliative claim, including for the retaliatory demotion, discharge, and post-employment retaliation, all of which is in violation of the Federal False Claims Act, 31 U.S.C. § 3730(h), Relator is claiming compensatory and special damages, including back pay and front pay (or, in the alternative reinstatement if the Court deems it appropriate); two (2)

times the amount of backpay with interest; punitive damages; prejudgment interest; reasonable attorney fees; litigation costs; a jury to try this cause; and other injunctive relief as deemed appropriate by the Court.

## X.    REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

RESPECTFULLY SUBMITTED,

*/s/ William (Bill) Nettles*
William (Bill) Nettles
Federal Bar No: 6586
Bill Nettles, Attorney at Law
2008 Lincoln Street
Columbia, SC 29201
Telephone: (803) 814-2826
Email: bill@billnettleslaw.com


David A. Burkhalter, II, TN BPR #004771*
D. Alexander Burkhalter, III, TN BPR #033642*
Zachary J. Burkhalter, TN BPR #035956*
**THE BURKHALTER LAW FIRM, P.C.**
111 S. Central Street
P.O. Box 2777
Knoxville, TN 37901
(865) 524-4974 Phone
(865) 524-0172 Facsimile
*To be admitted pro hac vice*

**COUNSEL FOR RELATOR / PLAINTIFF**


JUNE 22, 2021
COLUMBIA, SOUTH CAROLINA