IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| JOEY EDWARD M. ROQUE, M.D. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No.: 4:21-cv-01903 |
| | ) | Judge: Joseph Dawson, III |
| ENCOMPASS HEALTH CORPORATION, | ) | |
| MYRTLE BEACH REHABILITATION | ) | |
| HOSPITAL, LLC d/b/a TIDELANDS HEALTH | ) | **JURY TRIAL DEMAND** |
| REHABILITATION HOSPITAL, affiliate of | ) | |
| ENCOMPASS HEALTH CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

---

## AMENDED AND RESTATED COMPLAINT

---

COMES NOW, the Plaintiff, JOEY EDWARD M. ROQUE, M.D., by and through counsel and pursuant to the Court's Order entered on January 22, 2024, files this Amended and Restated Complaint, and sues the Defendants, ENCOMPASS HEALTH CORPORATION, MYRTLE BEACH REHABILITATION HOSPITAL, LLC d/b/a TIDELANDS HEALTH REHABILITATION HOSPITAL, affiliate of ENCOMPASS HEALTH CORPORATION, and would show unto this Honorable Court as follows:

1.      Plaintiff, Joey Edward M. Roque, M.D., is a citizen and resident of Horry County, Myrtle Beach, South Carolina.

2.      Defendant, Encompass Health Corporation (hereinafter "Encompass Health"), formerly known as "HealthSouth Corporation" until its name was changed on or about January 1, 2018, is a publicly-traded for-profit corporation (NYSE: EHC), incorporated in the State of Delaware, with its principal address and mailing address at 9001 Liberty Parkway, Birmingham, Alabama 35242, and registered agent, CT Corporation System, at 2 North Jackson Street, STE

605, Montgomery, Alabama 36104.

3.      Defendant, Myrtle Beach Rehabilitation Hospital, LLC d/b/a Tidelands Health Rehabilitation Hospital, an affiliate of Encompass Health (hereinafter "Tidelands Health") is a for-profit corporation incorporated in the State of Delaware, with its main hospital facility, Tidelands Waccamaw Community Hospital, located at 4070 US Highway 17 Bypass South, Murrells Inlet, SC 29576, and, as of March 23, 2023, its registered agent is Corporation Service Company, 508 Meeting Street, West Columbia, South Carolina, 29169.

4.      This Court has subject matter jurisdiction to adjudicate this action under 28 U.S.C. §§ 1331 and 1345, because this action is brought pursuant the False Claims Act, 31 U.S.C. § 3730(h).

5.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact and have transacted business in this District and maintain an office in this District.

6.      Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and Defendants transacted business and maintained an office in this District.

7.      At all times material hereto, each Defendant is an employer engaging in an industry affecting commerce.

8.      At all times material hereto, each Defendant is subject to the provisions of the False Claims Act, including 31 U.S.C. § 3730(h).

9.      At all times material hereto, each Defendant was a participant in the government healthcare programs, such as Medicare and TRICARE/CHAMPUS, 10 U.S.C. § 1071, *et seq*., and other government-funded healthcare programs (collectively hereinafter "Government Payors"),

and it billed to and received money from Government Payors.

10.     At all times material hereto, Defendant Encompass Health is the largest owner and operator of inpatient rehabilitation facilities ("IRF") in terms of patients, number of hospitals, and with net operating revenue for its inpatient rehabilitation division in excess of three billion dollars ($3,000,000,000.00) every year since 2018.

11.     By way of background, to be eligible to receive payments for providing rehabilitation and therapy services, the IRFs such as Defendants must comply with the requirements of the Medicare and Medicaid programs.

12.     Under these Government Payor programs, IRFs must meet a minimum percentage of a facility's total patient population, known as a "compliance threshold," to be deemed eligible to receive payments for providing IRF rehabilitation and therapy services.

13.     The compliance threshold requires that sixty percent (60%) or more of the patient population must fall within one (1) of the thirteen (13) medical conditions (referred herein as "CMS-13" diagnosis) that qualify for the sixty percent (60%) threshold and which include: (1) Amputation, (2) Arthritis, (3) Brain injury, (4) Burns, (5) Congenital deformity, (6) Femur (hip) fracture, (7) Major multiple trauma, (8) Neurological disorders, including multiple sclerosis, motor neuron diseases, polyneuropathy, muscular dystrophy, and Parkinson's disease, (9) Spinal cord injury, (10) Stroke, (11) Systemic vasculidities with joint inflammation, resulting in significant functional impairment of ambulation and other activities of daily living that have not improved after an appropriate, aggressive, and sustained course of therapy services, among other requirements, (12) Severe or advanced osteoarthritis (osteoarthrosis or degenerative joint disease) involving two or more major weight bearing joints with joint deformity and substantial loss of range of motion, atrophy of muscles surrounding the joint, significant functional impairment of

ambulation and other activities of daily living that have not improved after the patient has participated in therapy services among other requirements, and (13) Knee or hip joint replacement, or both, during an acute hospitalization immediately preceding the inpatient rehabilitation stay and also meet one or more other criteria.

14.     By maintaining the sixty percent (60%) compliance threshold for IRF accreditation, the IRFs are thereby exempt from the acute hospital prospective payment system. If a hospital does not meet this sixty percent (60%) threshold, then it loses this distinction from a typical acute hospital and does not achieve IRF accreditation, and therefore will not be able to use the IRF payment classification, and instead will be categorized as a general acute care hospital and required to use the acute hospital prospective payment system.

15.     Under Medicare, the Government Payors reimburse IRFs, such as Defendants, for costs expended on therapy and rehabilitation services that are provided to qualifying Medicare beneficiaries based on the amount of resources the IRF is expected to spend to rehabilitate the beneficiaries pursuant to a per-discharged prospective payment system, and, because the amount of reimbursement to the IRF is tied to the amount of resources the IRF is expected to use for the beneficiaries' rehabilitation, higher disability ratings at admission result in higher reimbursement.

16.     IRF rehabilitation therapy and services must meet the reasonable and necessary criteria to be eligible for reimbursement from Government Payors like Medicare, which includes key decision points considered and documented when making a decision to admit, retain, or discharge an IRF patient; certain pre-admission requirements; a post-admission physician evaluation to verify the patient's pre-admission; and specific requirements for an overall plan of care for each individual.

17.     To be considered reasonable and necessary IRF therapy and rehabilitative services

by Government Payors, the IRFs must determine in relevant part, that the patient is: (A) Medically stable to benefit from IRF services but continue to require 24/7 medical and nursing care; (B) Needs the coordinated care of multiple therapy disciplines unique to IRFs; (C) Benefits from the intense rehabilitation therapy programs unique to IRFs; (D) Requires close medical supervision to manage the medical conditions to support participation in an intense rehabilitation therapy programs; (E) Possess the cognitive ability to understand commands and retain information; and (F) Able to tolerate three (3) hours of therapy five (5) days a week and make measurable improvement during their IRF stay.

18.      Government Payors will only reimburse IRFs for reasonable and necessary services when the above criteria is met. Patients improperly admitted that do not meet this criteria, such as with an upcoded and/or falsified diagnosis to justify IRF therapy and/or the CMS-13 compliance threshold, in order to receive payment for IRF would be considered fraudulent and a false claim, and all requests and/or payments made for such patients are in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq*. (hereinafter "FCA").

19.      Defendants routinely engage, and conspire to engage, in fraudulent billing schemes, as identified herein, with one singular goal: Increase profits.

20.      At all times material hereto, one of the IRF facilities owned and operated by Defendants is the Defendant Tidelands Health.

21.      At all times material hereto, Defendant Tidelands Health has two IRF locations in South Carolina: 4070 Hwy 17 Bypass South, Murrells Inlet, SC 29576 (hereinafter "Murrells Inlet") and 100 Water Grande Boulevard, Little River, SC 29566 (hereinafter "Little River").

22.      At all times material hereto, Carey Swanson was the CEO of Defendant Tidelands Health and she had been in this role since 2018.

23.     As CEO of Defendant Tidelands Health, Carey Swanson was an agent and employee of the Defendants.

24.     As CEO of Defendant Tidelands Health, Carey Swanson had the authority to discipline and terminate the physicians working at and/or out of the two IRF facilities at Murrells Inlet and Littler River, including the Plaintiff.

25.     As CEO of Defendant Tidelands Health, Carey Swanson reported to and was supervised by the Regional President of the Mid-Atlantic region, Ed Mowen.

26.     Ed Mowen was employed by Defendant Encompass Health since 2005 up until his retirement in or around February 2021.

27.     As Regional President of the Mid-Atlantic region, Ed Mowen was responsible for approximately 22 inpatient rehabilitation IRF facilities that are operated by Defendants in Maryland, North Carolina, South Carolina, Virginia, West Virginia, and parts of Tennessee, with each facility having a designated employee, such as the CEO, reporting directly to Mowen.

28.     At all times material hereto, on information and belief, Ed Mowen reported directly to the CEO of Defendant Encompass Health, Jack Tarr.

29.     At all times material hereto, Dr. Lisa Smaldone (also known as "Dr. Smaldone") was the Medical Director of Defendant Tidelands Health, and she had been in this role since January 2019.

30.     As Medical Director of Defendant Tidelands Health, Dr. Lisa Smaldone was an agent and employee of the Defendants.

31.     As Medical Director of Defendant Tidelands Health, Dr. Lisa Smaldone had the authority to discipline and terminate the physicians working at and/or out of the two IRF facilities at Murrells Inlet and Little River, including the Plaintiff.

32.    At all times material hereto, Defendant Tidelands Health's Medical Director, Dr. Lisa Smaldone, has an active NPI (NPI No. 1891794236), and her primary taxonomy is Internal Medicine under her South Carolina Medical License (No. 26891).

33.    At all times material hereto, Dr. Lisa Smaldone's Primary Practice Address is listed as 820 67th Ave N. #70692, Myrtle Beach, SC 29572-2957, and her Secondary Practice Address is listed as 107 Woodwind Ct, Myrtle Beach, SC 29572-4119, according to her NPPES NPI Registry.

34.    At all times material hereto, Dr. Lisa Smaldone's private medical practice hired and supplied the majority of the physicians working at Defendant Tidelands Health's IRF facilities, such as Drs. Evelyn Parish, Marlo Bruno, and Donny King, as well as various Nurse Practitioners, such as Mary Harding, Lindsey Jernigan, and Jessica Iono, in order to give the appearance that the physicians are not controlled by Defendants but, in reality, Dr. Smaldone worked closely with leadership, including the CEO over Tidelands Health, Carey Swanson, to accomplish the fraudulent schemes as alleged herein. With Dr. Smaldone acting as the Medical Director, she is able to control, direct, and instruct the physicians working at Tidelands Health—the majority of which happen to also be her employees through her private medical practice—to engage in the fraudulent conduct identified herein, such as pressuring the physicians to admit patients who are not appropriate for IRF services, such as non-CMS-13, too sick to participate in IRF, etc., and those patients are then assigned a false diagnosis to justify IRF admission.

35.    At all times material hereto, Plaintiff is a licensed medical doctor specializing in Physical Medicine and Rehabilitation, also known as Physiatry.

36.    As far as Plaintiff's background, he is a Diplomate, American Board of Physical Medicine and Rehabilitation; member of the American Academy of Physical Medicine and

Rehabilitation; licensed with the South Carolina Board of Medical Examiners; licensed with the Tennessee Board of Medical Examiners since 2012; licensed with the Illinois Dept. of Professional Regulation from 2003 to 2008; licensed with the North Carolina Medical Board from 1999 to 2001; and licensed with the Professional Regulation Commission, Philippines, since 1993.

37.    Plaintiff originally began working for the Defendant Encompass Health's Central and Memphis-North facilities on August 13, 2018, as a locums tenens physician in Memphis, Tennessee.

38.    In December 2018, forward, Plaintiff began working as a locum tenens physician at Defendant Tidelands Health location.

39.    Shortly thereafter, Plaintiff entered into a two (2) term contract with Defendants set to begin on May 10, 2019 to work as the Associate Medical Director of Defendant Tidelands Health.

40.    At all times material hereto, Plaintiff was qualified to perform the position of Associate Medical Director of Defendant, Tidelands Health.

41.    During his tenure at Defendant Tidelands Health, Plaintiff performed his duties in a reasonable and competent manner.

42.    During his tenure at Defendant Tidelands Health, Plaintiff was never written up for any disciplinary reason.

43.    Despite paying millions of dollars to resolve previous FCA violation allegations, Defendants continue to engage in blatant and rampant fraud, including using false diagnoses to justify IRF admissions that are unsupported by any clinical evidence, as alleged herein, as Plaintiff has personally observed Defendants continuing to engage in similar fraudulent schemes to justify IRF admission and increase the amount of reimbursement from Government Payors by any means

necessary. In fact, Defendants simply pivoted from using one false blanket diagnosis of "disuse myopathy," after Defendants settled for millions of dollars one FCA lawsuit for falsely using this diagnosis, to using another false blanket diagnosis of "critical illness myopathy," which is an even more extreme and debilitating illness and diagnosis, to justify the IRF admissions of Government Payor patients, even when the underlying medical records did not support such a diagnosis.

44.    During his tenure at Defendant Tidelands Health, Plaintiff observed and objected to various forms of fraudulent conduct in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq*., because the conduct resulted in Government Payors reimbursing Defendants for more than otherwise should have been paid, if at all, including, but not limited to, due to Defendants admitting Government Payor patients who did not qualify for IRF because of their declined health status and are essentially "too sick" to participate in IRF therapy; fraudulently altering the Initial Assessments of the patient's functional abilities and goals (known as Section GG in the CMS required Inpatient Rehabilitation Facility – Patient Assessment Instrument, formerly known as "Functional Independence Measure" prior to October 2019) measuring the patient's level of functional disability and the degree of the impairment to make it appear as if the patients are "sicker" at admission to justify a longer stay in order receive a higher reimbursement; falsifying the underlying medical records to increase the patients' lengths of stay and also extending the patients' discharge by limiting the number of patients to be discharged on a daily basis; fraudulently re-admitting patients for additional IRF therapy stays within a few months of a prior IRF stay for the same or similar diagnosis (otherwise known as "second chance" admissions); and inappropriately and unnecessarily billing for "consultations" by and/or between physicians with the same specialties, including, in particular, consultations by and/or between the Internal Physicians such as the Medical Director, Dr. Smaldone and one of the various Internal Physicians that she employs

in her private medical practice, as opposed to the Physical Medicine and Rehabilitation physicians (otherwise known as Physiatrists).

45.     To accomplish the fraudulent schemes set forth herein, Defendants utilize strict top-down training, such as various pamphlets, brochures, PowerPoint presentations, face-to-face "coachings," and so forth to essentially coach its various IRF facilities and employees on how to justify patient IRF admissions and discharges to Government Payors like Medicare.

46.     Defendants' employees, such as the Admissions personnel (*i.e.*, Nurses/Admissions Liaisons), who are responsible for filling out the Pre-Admission Screening ("PAS") forms and often insert leading statements therein to assist the attesting physician with rubber-stamping the IRF admission, are the only employees held to assigned quotas for the number of patients admitted. In turn, Admissions personnel are financially incentivized to push and/or approve admissions of patients to the IRFs to meet certain quotas required by Defendants, and which result in cash bonuses.

47.     At all times material hereto, Defendants engaged in a number of tactics to manipulate physicians to sign off on the Pre-Admission Screening ("PAS") forms as quickly as possible in order to have patients admitted for IRF, otherwise known as Defendants' "Rapid Admission Program." Essentially, Defendants maintain a "policy" that all patient IRF referrals must be approved by physicians within two (2) hours of receiving the referral and physicians are immediately prompted to approve the completed PAS from the Admissions/Nurse Liaisons as soon as it is sent to the physicians. Defendants authorize and empower non-physicians, particularly Nurse Liaisons and other Admissions personnel ("Admissions/Nurse Liaisons") to decide the eligibility of patients' admissions and Case Managers to decide the eligibility of patients' discharges, including the patients' CMS-13 diagnosis, and/or Rehabilitation Impairment

Category, and/or predetermining the classification, regardless of whether those patients actually met the IRF criteria per Government Payors' conditions of payment. In turn, Defendants then closely track and monitor how long it takes the Admissions/Nurse Liaisons to complete the PAS forms and provide the forms to physicians for approval. Defendants likewise track and monitor the physicians' turnaround time regarding how long it takes them to approve the PAS forms for IRF admissions. If the physicians take longer than two (2) hours, then they are called out by the administration for being "too slow," even if the physicians insist on reviewing the complete patient record before approving the PAS. Physicians also receive multiple text messages from different members of the referral team and are often met at the hospital floors while conducting the face-to-face patient evaluations. Admissions/Nurse Liaisons send the physicians a list of the patients' PAS forms that need to be approved "as soon as possible" with the physician's signature, but no longer than two (2) hours per policy, while also asserting that those patients are either a "same day admission," and/or that the "patient is on the way" to the facility to be admitted, and/or that "we will lose this patient" to another facility if the patient is not admitted as soon as possible, and/or "we are waiting for you to sign the documents" because the patient is ready to be admitted. This constant badgering interferes with the physician's ability to meaningfully review the patients' records to determine whether IRF admission is appropriate or even consistent with Government Payors' criteria, and often results in the physician eventually caving in and approving non-qualifying patients for IRF admission.

48.    For example, on July 16, 2019, at the Murrells Inlet facility, one of the locums physicians, Dr. David Turk, blindly signed off on the PAS forms to admit numerous patients for IRF, without reading their information to determine if the patients met the IRF criteria for eligibility. Dr. Turk instead simply clicked through several patient referrals, without reviewing the

electronic records therewith, to approve all of the referred patients for IRF admission. When Plaintiff discussed with Dr. Turk why he was doing this, Dr. Turk responded, "that's what they expect me to do."

49.     As a result of this constant pressure, the Plaintiff complained on more than one occasion about the importance of having physician oversight and that Defendants were allowing non-physicians, like Admissions/Nurse Liaisons, make the decisions on patients' IRF admissions before the physicians had a chance to thoroughly review the patients' cases.

50.     The following examples illustrate how Defendants implemented these high-pressure tactics against Plaintiff: In January 2019, shortly after Plaintiff began working as a locums physician at the Murrells Inlet facility, the Plaintiff was instructed by the Director of Business Development/Marketing at the time, Jennifer Droppleman, to sign off on a PAS approving a patient's IRF admission.  As the Plaintiff received the message to sign off on the PAS, he observed that the admission board in his facility already had the patient's name listed and a room was already assigned to the patient in the hospital for IRF, all of which was done before the Plaintiff even had the chance to review the medical records to determine whether this patient met the IRF criteria required by Government Payors.  Plaintiff asked for a meeting in the hospital unit on the same day and spoke with Droppleman and the Nurse Rehabilitation Liaison, Mike McKinley, to outline his approach on reviewing PAS forms and to emphasize his role in determining the appropriateness of an admission.  During their meeting, Plaintiff underscored the Government Payor (Medicare) guidelines that no patient should be admitted without physician approval.  Plaintiff's explanations were met with consternation by both Droppleman and McKinley, and, further, McKinley indicated that Nurse Liaisons like himself essentially make the IRF admission decision over ninety percent (90%) of the time.

51.     If at any point during this process the physicians refuse to approve the PAS for IRF admission, then Defendants have implemented other procedures to challenge and effectively bypass the physician's decision and medical judgment, such as by having the PAS form automatically transferred and reviewed by another physician, thereby effectively overriding the original denial, or even send the PAS form to another one of Defendants' own affiliated IRF facilities for admission. In the vast majority of these rejected cases, management over the Admissions/Nurse Liaisons personnel, including CEO, Carey Swanson, Director of Business Development/Marketing, Jennifer Droppleman, who was later demoted and replaced by Ashley O'Sullivan in early 2020 for failing to meet assigned quotas for target IRF admissions, and even Nurse Liaisons, such as Jacob Dill, challenge the physicians' decisions not to approve the PAS for IRF admissions, berate physicians for denying IRF therapy, accuse physicians of delaying IRF admissions, and then request that they reconsider for any number of reasons to justify IRF admissions. This effectively makes a mockery of the PAS process, physicians' medical judgment, and eligibility criteria for IRF admissions.

52.     For example, in early 2020, the new Director of Business Development/Marketing at the time, Ashley O'Sullivan, and Nurse Liaison, Jacob Dill, challenged Dr. Evelyn Parish's decision to deny IRF admission for Patient 9,[1] who did not qualify for IRF admission per Government Payors' criteria, and they were eventually able to get the denial reversed after discussing it with the Medical Director, Dr. Lisa Smaldone.

53.     The above-described falsified admission was rampant throughout Plaintiff's employment, as alleged herein, and occurred as a result of how Defendants operate the IRF facilities, that is, primarily by marginalizing the medical judgment and decision-making of the

_____
[1] Information regarding patients referenced herein will be provided to Defendants during discovery.

Rehabilitation physicians, like Plaintiff, because the Rehabilitation physicians are expected and, at times, instructed to simply rubber-stamp the decisions that are made by the Admissions/Nurse Liaisons at admission, and Case Managers at discharge, and, if the physicians refuse to do so, then their medical judgment is railroaded and/or circumvented such as directly by the leadership over the IRF, because the goal is to ultimately obtain the patients' admission for IRF therapy.

54. Further, Defendants hire and retain physicians who will go along with the fraudulent schemes by aggressively recruiting and hiring physicians who are nominally trained in the field of Rehabilitation Medicine, such as Internal Medicine physicians, and then effectively rebadge these physicians as "rehabilitation specialists" and/or "rehabilitation physicians" to give the appearance that they are familiar with IRF therapy and Government Payor criteria for IRF eligibility, when, in fact, they are not, so that these physicians will often defer to the Admissions personnel/Nurse Liaisons' judgment to admit patients. In fact, in early 2020, Medical Director, Dr. Smaldone, complained about the challenges she was facing by trying to screen patients for IRF admission and that she "could've gotten a higher stipend [from Defendants]" had she "not refused the condition imposed by the CEO [Carey Swanson] to sign every pre-admission screen or reverse denials that came [her] way." CEO, Swanson, attempted to impose this "condition" on Dr. Smaldone, by bribing her with additional compensation, to approve every patient for IRF without question and without regard to the patients meeting the IRF criteria for eligibility.

55. Moreover, at all times material hereto, Dr. Smaldone's specialty was Internal Medicine, but Defendants "credentialed" her as a Rehabilitation Physician.

56. After Plaintiff began discovering the fraudulent schemes identified herein, he complained to the CEO, Carey Swanson, on more than one occasion that he cannot rubber-stamp the false diagnoses to justify the IRF admissions of patients, particularly Medicare patients, and

this resulted in several arguments with Swanson—who is not a medical doctor—as well as subsequent retaliation due to Plaintiff's persistent objections and refusal to engage in the fraudulent conduct, such as Swanson questioning Plaintiff's "competency," accusing Plaintiff of depriving patients medical care, and Swanson also falsely claimed that Medicare benefits "require" IRF therapy.

57.     As Plaintiff's complaints about the inappropriate and fraudulent IRF admissions to the CEO, Carey Swanson, were ignored, Plaintiff also complained to other executive leadership of Defendant Encompass Health.

58.     In June 2019, Regional President at that time, Ed Mowen, visited the Little River facility for a site check.

59.     After a conference meeting in June 2019, Plaintiff approached Ed Mowen and CEO, Carey Swanson, to complain about how Plaintiff was falsely accused of "interfering" with the IRF admission of a Medicare patient, which Plaintiff further conveyed to Mowen was due to the overall attitude of management whenever there was any denial or delay in the IRF admissions. However, Mowen did not say anything in response. Instead, Swanson interrupted Plaintiff by stating to "not to go any further," and then Swanson and Mowen abruptly exited the conference room.

60.     Around that same timeframe, due to Defendants continually ignoring Plaintiff's persistent complaints about the inappropriate and fraudulent IRF admissions, on August 23, 2019, Plaintiff inquired to Defendant Tidelands Health's Controller, Teresa Martin, about what he must do to decline to accept the "income guarantee," as set forth in his contract with Defendants, because leadership such as the CEO, Carey Swanson, was using this "income guarantee" against Plaintiff as leverage in the attempt to coerce him to engage in fraudulent conduct by admitting inappropriate

patients that were not eligible for IRF and suggesting false and fraudulent admitting diagnoses.

61.     At that time in August 2019, Plaintiff's agreement with Defendants included an "income guarantee" that paid Plaintiff a substantial monthly stipend, but the agreement treated these payments as essentially a "loan" that would be forgiven if Plaintiff continued to work for Defendants for at least 2 years, at which time the "loan" would gradually be forgiven every month that Plaintiff stayed beyond his first year. However, if Plaintiff left before his first year, then the agreement required him to pay the repay the amounts of the "loan" with interest.

62.     Therefore, Plaintiff refused to continue to accept the "loan" stipend and to not be dependent on this "guaranteed" income because, contrary to Swanson's assertions and insinuations leading up to August 2019, this income was not a *quid pro quo* arrangement that Plaintiff was to "earn" by inappropriately admitting patients for IRF.

63.     On August 26, 2019, Plaintiff complained to the Controller, Teresa Martin, via email about some of his concerns he had observed during his employment and related issues caused by management, including that CEO, Swanson, "has clearly stated that I have to 'earn my income guarantee' by being forced to take patients at the rehabilitation unit at Tidelands Waccamaw when the [sic] Dr. Smaldone refused to admit the patients that she approved to go to her assigned hospital."

64.     On September 10, 2019, Plaintiff inquired to CEO, Carey Swanson, about how he can terminate the income guarantee and the amount he will have to repay as outlined in the agreement he initially signed on May 10, 2019, which ultimately resulted in Plaintiff having to pay back $28,720.66 to get out of having to continue working for Defendants for another year or more when the income guarantee advances would be eventually "forgiven" pursuant to the agreement, all of which was to Plaintiff's financial detriment, humiliation, and embarrassment, due to his

refusal to participate in the fraudulent schemes as set forth herein.

65.     On or about September 11, 2019, Plaintiff also complained to Defendant Encompass Health's VP for Medical Affairs, Dr. Joseph Stillo, about how the team conferences are not complying with the regulatory criteria of Medicare, that staff have made false accusations and diagnoses to justify IRF admissions, that Plaintiff's denials of patients who did not qualify for IRF admission were later reversed by the Medical Director, Dr. Smaldone, and that Plaintiff was berated by Defendant Tidelands Health for holding a meeting with the therapy staff when the Plaintiff expressed concerns about how the team conferences are not complying with Medicare's criteria. However, Dr. Stillo was dismissive of Plaintiff's complaints, did not act at all surprised, and did not ask any follow-up questions.

66.     Equally concerning is that shortly thereafter, in mid-September 2019, forward, Plaintiff began noticing that his PAS forms were being deleted and/or edited whenever he denied a patient for IRF admission, including on September 19, 2019, when Plaintiff questioned the Nurse Liaison Director, Roberta Hamilton, why there was "selective editing" of his comments in the patient PAS forms.

67.     Later that same day, September 19, 2019, during a leadership conference with CEO, Carey Swanson, Medical Director, Dr. Smaldone, and Director of Business Development/Marketing at that time, Jennifer Droppleman, Plaintiff questioned why his comments in the PAS forms were being deleted, and why there was "selective editing" to remove his comments regarding the reasons a patient was denied IRF admission.

68.     During the leadership conference on September 19, 2019, Plaintiff further complained that he was asked by Nurse Liaison, Jacob Dill, if he could sign off on a PAS for a patient that was already in route to the Little River facility for IRF admission, to which Plaintiff

stated to CEO, Swanson, that he cannot just "rubber-stamp" each IRF admission sent to him.

69.    The following day, September 20, 2019, CEO, Carey Swanson, provided Plaintiff with a ninety (90) days' notice that his contract with Defendants was being terminated and he was being removed as the Associate Medical Director, effective December 19, 2019.

70.    Removing Plaintiff from the Associate Medical Director position was a substantial demotion and in retaliation for Plaintiff's attempts to stop the fraudulent submission of claims to Government Payors in violation of FCA, thereby also violating the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h).

71.    In or around the same timeframe in September 2019, the Medical Director, Dr. Lisa Smaldone, informed Plaintiff that she would be coming to his location at Little River and that Defendants were actively looking for another physician to fill Dr. Smaldone's position at the Murrells Inlet location in order to move her to the Little River facility and essentially take over the direction of the Little River facility, in the clear attempt to push Plaintiff out of his job. During this transition, Dr. Smaldone and Plaintiff both received PAS forms from the Admissions/Nurse Liaisons, and then, on December 17, 2019, as discussed below, Plaintiff was informed by the CEO, Carey Swanson, that Dr. Smaldone will be the sole reviewer of all PAS forms and, in turn, the decision-maker with respect to admitting patients for IRF therapy.

72.    As a result, Plaintiff began experiencing firsthand additional pressure by Defendants' leadership, including by the CEO, Carey Swanson, to admit inappropriate patients for IRF therapy, such as admitting said patients with false diagnoses in violation of the Government Payors' criteria for IRF admissions, and therefore in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq*.

73.    For example, on September 24, 2019, Swanson requested for Plaintiff to admit a

Medicare patient that did not qualify for IRF, <u>Patient 6</u>, and when Plaintiff attempted to explain why the patient was ineligible for IRF therapy per the Government Payors' criteria, Swanson "suggested" for Plaintiff to use the diagnosis of "myopathy" to justify the IRF admission.

74.    However, Plaintiff refused to admit <u>Patient 6</u> because the patient did not have myopathy; rather, <u>Patient 6</u> only presented with back pain and a urinary tract infection.

75.    It would be a violation of the False Claims Act, 31 U.S.C. 3729, *et seq*., for Defendants to knowingly "diagnosis" a Medicare beneficiary with "myopathy" to justify IRF admission when, in fact, the patient did not have myopathy.

76.    Later that same day on September 24, 2019, however, Plaintiff's decision was overruled by the Medical Director, Dr. Lisa Smaldone, and <u>Patient 6</u> was thereafter admitted.

77.    As a result, Plaintiff complained to Medical Director, Dr. Lisa Smaldone, about her overruling his decision to deny Patient 6's IRF admission and that the patient was inappropriately admitted.

78.    In response, Dr. Lisa Smaldone actually admitted to Plaintiff that "inappropriate patients are being admitted to fill beds," referring to patients who were not eligible for IRF per Government Payors' criteria for IRF admissions. At that point, Plaintiff noticed that the PAS form wherein he previously documented his refusal to admit Patient 6 had mysteriously disappeared from Defendants' internal system and a new PAS had been created with Dr. Smaldone's signature approving Patient 6 for IRF admission with the pre-determined language of "Primary Acute Diagnosis: NEUROLOGICAL CONDITIONS" in the absence of any verifiable information in the PAS.

79.    The IRF admission of Patient 6 on September 24, 2019 was the first time that the CEO, Carey Swanson, directly involved the Medical Director, Dr. Smaldone, to override

Plaintiff's decision to deny the IRF admission, and thereafter, Swanson took on a more active role in pressuring the Plaintiff to sign off on PAS forms in order to fraudulently and unnecessarily admit Government Payor patients for IRF therapy who were otherwise unqualified to receive such therapy.

80.     The very next day, on or about September 25, 2019, Patient 18, a Medicare beneficiary with a wrist fracture, was referred to Defendants for IRF therapy by a home health agency, Medical Services of America, Inc. Nurse Liaison, Colleen Walz, created Patient 18's PAS form and effectively suggested that Patient 18 should be diagnosed with "myopathy" to justify her IRF admission. Yet, Patient 18 only had a wrist fracture, which is not a qualifying CMS-13 diagnosis to justify IRF admission. Nurse Liaison, Walz, presented Patient 18's case and even later commented in the PAS form that Patient 18 was not a candidate because of a non-CMS-13 compliant diagnosis and only received one day of home therapy.

81.     However, on September 26, 2019, despite Patient 18 being previously rejected for IRF therapy, Nurse Liaison, Colleen Walz advised Plaintiff that Patient 18 had been approved for IRF admission. Walz stated that the Director of Business Development/Marketing at the time, Jennifer Droppleman, instructed Walz to process Patient 18, and circumvent the process by directly requesting approval and obtaining pre-authorized approval from the Government Payor (Medicare), all of which was without physician approval. Plaintiff's original comments in the PAS form explaining why Patient 18 was not eligible for IRF therapy, due to lack of "medical necessity" and "non-complying CMS diagnosis" for a wrist fracture, were actually deleted (or "scrubbed") from the PAS. Patient 18 was then admitted at the Little River location for IRF therapy with a diagnosis of wrist fracture, from September 27, 2019 to October 9, 2019.

82.     Shortly thereafter, on October 3, 2019, Plaintiff participated in a conference call

with the three executives that form the leadership of Defendant, Tidelands Health: CEO, Carey Swanson, Director of Business Development/Marketing at the time, Jennifer Droppleman, and Medical Director, Dr. Lisa Smaldone, to essentially discuss the "admission criteria" of the patients falsely admitted at Defendants' IRFs.

83.     During the conference call on October 3, 2019, Plaintiff brought up his concerns about using the false diagnosis "encephalopathy" and/or "myopathy" for the IRF admissions, along with the push to bring patients from home into the hospitals for IRF therapy.

84.     During the conference call on October 3, 2019, Plaintiff mentioned how he was surprised when the CEO, Carey Swanson, tried to suggest a particular diagnosis for patients, and how she tried to take back her suggestion of "disuse myopathy" and actually said she meant "critical illness myopathy" and Plaintiff further questioned Swanson regarding several of the patients being admitted with a urinary tract infection or pneumonia, and using the term "toxic metabolic encephalopathy" to justify the IRF admissions, because these conditions had already resolved *before* those patients' IRF admissions. In response, Swanson stated that "the key is to get them [admitted] fast enough before it [their underlying conditions] resolves," but even when the underlying condition has resolved, the Defendants continue to use the "encephalopathy" to justify IRF admission.

85.     It is fraudulent and in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq*., for Defendants to admit Government Payor beneficiaries using false diagnoses in order to justify their IRF admissions.

86.     Plaintiff engaged in "protected activity" within the meaning the False Claims Act, 31 U.S.C. § 3729, *et seq*., during the conference call on October 3, 2019 due to his efforts to stop one or more of the ongoing violations of the False Claims Act, 31 U.S.C. § 3729, *et seq*.

87.    During the October 3, 2019, conference call, the CEO, Swanson, also referenced a general statement from Medicare Benefit Manual, at Section 110 - Inpatient Rehabilitation Facility (IRF) Services, which provides, in relevant part:

> The inpatient rehabilitation facility (IRF) benefit is designed to provide intensive rehabilitation therapy in a resource intensive inpatient hospital environment for patients who, due to the complexity of their nursing, medical management, and rehabilitation needs, require and can reasonably be expected to benefit from an inpatient stay and an interdisciplinary team approach to the delivery of rehabilitation care.
>
> The IRF benefit is not to be used as an alternative to completion of the full course of treatment in the referring hospital.  A patient who has not yet completed the full course of treatment in the referring hospital is expected to remain in the referring hospital, with appropriate rehabilitative treatment provided, until such time as the patient has completed the full course of treatment.  Though medical management can be performed in an IRF, patients must be able to fully participate in and benefit from the intensive rehabilitation therapy program provided in IRFs in order to be transferred to an IRF.  IRF admissions for patients who are still completing their course of treatment in the referring hospital and who therefore are not able to participate in and benefit from the intensive rehabilitation therapy services provided in IRFs will not be considered reasonable and necessary.
>
> Conversely, the IRF benefit is not appropriate for patients who have completed their full course of treatment in the referring hospital, but do not require intensive rehabilitation.  Medicare benefits are available for such patients in a less-intensive setting.
>
> (*See* Medicare Benefit Policy Manual, Chapter 1 – Inpatient Hospital Services Covered Under Part A, Section 110, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c01.pdf) (emphasis added).

88.    The October 3, 2019, conference call further confirmed for Plaintiff that Defendants are applying an overly broad interpretation of "medical necessity" for inpatient rehab solely to justify admissions to the IRFs and have even stretched it to include admissions from the patients' homes, even if the Medicare Benefit Policy Manual (quoted above) primarily refers to "hospital referrals." Without a referral, Defendants cannot work up a patient for admission. Once Defendants get a referral, they are going to mine it or shape it to justify the IRF admission, and

therefore, reimbursement from Government Payors.

89.     On October 3, 2019, CEO, Carey Swanson, also sent out an email to Plaintiff, Medical Director, Dr. Smaldone, and others, with the subject line "Review of admission criteria" in regards to how Swanson was noticing an increase in the number of IRF denials, largely due to Plaintiff's refusal to use a false diagnosis to justify admission. In her email, Swanson remarked that Defendants are "not required to show that care could have been provided at a less intensive setting" but this runs counter to the specific instruction from Government Payors, including the Medicare Benefit Policy Manual, which states, in relevant part: "[T]he IRF benefit is not appropriate for patients who have completed their full course of treatment in the referring hospital, but do not require intensive rehabilitation. Medicare benefits are available for such patients in a less-intensive setting." (Medicare Benefit Policy Manual, Chapter 1 – Inpatient Hospital Services Covered Under Part A, Section 110, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c01.pdf) (emphasis added). Essentially, CEO, Swanson, believes every Government Payor beneficiary, especially Medicare patients, that have a medical diagnosis and rehabilitation should come to IRF for rehab as part of the Medicare benefits.

90.     As the CEO, Carey Swanson, pushed for more IRF admissions, she announced during a "Physician Collaboration Meeting" on October 31, 2019, that "corporate" Encompass Health has a "target budget" for Tidelands Health at a "total of 60 patients for both facilities," and Swanson insisted that Tidelands Health stay within this target budget at all times.

91.     At that time in October 2019, Defendant Tidelands Health was meeting its "Census Goals" because there were 25 patients at the Murrells Inlet location and 37 patients at the Little River location for a total of 62 patients.

92.     CEO, Carey Swanson, closely tracked the target budget and census goals of

Defendant Tidelands Health because Defendant Encompass Health was also closely monitoring and tracking this same information across each of its IRF facilities and also deciding the ideal "target budget" for each facility to ensure profitability.

93.     In fact, as of the date of the meeting on October 31, 2019, Defendant Tidelands Health had CMS-13 diagnosis compliance rating from 2018-2019 that averaged 73.68%, and in the following year from 2019-2020, it averaged over 80%, both of which were substantially higher than similar IRF facilities, such as those operated by Defendants' competitors.

94.     CEO, Carey Swanson, often bragged on multiple occasions that their facilities had an 80%-plus compliance rating, since these compliance ratings are much higher than the 60% threshold required by CMS for IRF facilities to maintain their accreditation. However, these numbers were fraudulently manufactured by Defendant's and would be significantly lower if Defendants accurately reported the patients' true conditions and diagnoses at admission.

95.     Leading up to the Plaintiff's demotion from the Associate Medical Director position per the hand-delivered letter from CEO, Carey Swanson, on December 17, 2019, Plaintiff was informed by the CEO, Carey Swanson, that Dr. Smaldone will be the sole reviewer of all PAS forms for both of Defendant Tidelands Health's facilities in determining whether a patient should be admitted for IRF.

96.     Defendants removed Plaintiff's discretion to review the PAS forms, and therefore his ability to decide whether a patient should be admitted for IRF, because Plaintiff was costing Defendants substantial amounts of revenue by denying the admissions of patients who were not appropriate for IRF and otherwise due to Plaintiff's refusal to admit patients with false and fraudulent diagnoses, and Defendants were also trying to humiliate and embarrass Plaintiff into quitting his job.

97.     As a result, from December 17, 2019, forward, with limited exception such as when Plaintiff was the only physician on-call, Dr. Smaldone was the sole reviewer of PAS forms due to Plaintiff's ongoing refusal to engage in the fraudulent conduct set forth herein, and Plaintiff did not have the discretion to reject an inappropriate patient for IRF, as Dr. Smaldone would approve patients for IRF admissions and then, if Plaintiff was on-call and/or the only physician on-duty, he was expected and instructed to physically admit the patients into the facility for treatment.

98.     However, in practice, by removing Plaintiff's ability to approve or deny patients for IRF admissions, Plaintiff no longer had oversight on the patients who were admitted under his care, and this resulted in Plaintiff's name being associated with the fraud, jeopardizing his medical license and career by forcing him to care for patients that did not qualify for IRF admissions. For example, for those patients that were given fraudulent and/or false diagnoses to justify their IRF admissions, Plaintiff tried ensure that those patients were ultimately assigned to Dr. Smaldone as the treating physician because Plaintiff did not want his name associated with any of the fraud, but this was not always an option because of the manner in which the IRF facilities operated.

99.     Shortly thereafter, on December 19, 2019, Plaintiff was in fact demoted from the Associate Medical Director position per the letter from the CEO, Carey Swanson, much to Plaintiff's humiliation, embarrassment, and financial detriment, as Plaintiff had been attempted to stop the IRF admissions that were inappropriate and fraudulent.

100.    After December 19, 2019, Plaintiff continued to work as a staff Physiatrist, but in a further diminished role and with less compensation, as Plaintiff was excluded from leadership meetings and the ability to review the PAS forms to admit or reject patients for IRF.

101.    As a result, on January 8, 2020, Plaintiff was ultimately left with no choice but to notify Defendants that he was terminating his contract with Defendants effective May 11, 2020,

after working for Defendants for one year, due to his diminished role and responsibilities, reduced patient load, decreased compensation, his overall declined health caused by the work environment, including severe stress that resulted in episodes of elevated blood pressure that did not respond to medications, and Plaintiff also did not want to be a part of an organization that institutionalizes fraud and enforces silence, and further risk his medical license if he was somehow implicated in the fraud, particularly due to Defendants changing the medical records of Plaintiff's patients and also removing Plaintiff's discretion to admit or deny patients for IRF.

102.    Thereafter, Plaintiff continued to work for Defendants in a limited capacity, by not being able to approve patients for IRF admission, but continued to observe and attempt to stop the ongoing fraudulent conduct as set forth herein.

103.    For example, in March 2020, while Plaintiff was on-call over the weekend and the sole reviewer of the PAS forms, Dr. Lisa Smaldone, was unavailable, Plaintiff received a call from the nursing staff that a patient was waiting to be admitted. Plaintiff called the Nurse Liaison about the admission and was informed that this patient had already been "approved to be admitted" by Jennifer Droppleman, the Director of Business Development/Marketing, but that Plaintiff still had to sign off on the PAS form to formally admit the patient. As Plaintiff was in route to the hospital, he received a call from CEO, Carey Swanson, who was very upset and angry, and accused Plaintiff of "not knowing what you're doing" and that "we have to admit this patient for PR [public relations] purposes" but Plaintiff explained that he would not admit the patient with a false diagnosis. Ultimately, however, Plaintiff admitted the patient for a dialysis related reason, which was a non-CMS-13 diagnosis, and further noted in the subsequent Admission Note that Swanson was "strongly urging" Plaintiff to admit the patient and that Swanson considered the patient "an appropriate candidate" for IRF admission.

104.    On February 22, 2020, Plaintiff reported the fraudulent conduct described herein to Catherine Perez, at the Center for Clinical Standards and Quality, CMS, Survey & Operations Group, Northeast Survey & Enforcement Division.

105.    At the request of Catherine Perez, on March 2, 2020, Plaintiff provided additional details regarding what Plaintiff believed CMS and/or OIG needed to investigate with respect to Defendants' fraudulent conduct.

106.    Further, on at least three separate occasions beginning in or around March 2020, forward, Plaintiff provided additional details regarding this fraudulent conduct to a Special Agent for the OIG.

107.    In or around this same timeframe, in February or March 2020, when Plaintiff was discussing the fraudulent and inappropriate IRF admissions with one of the other physicians, Dr. Parish, Plaintiff was informed that Defendant Encompass Health had recently settled a False Claims Act case for millions of dollars due to inappropriately admitting patients for IRF therapy, all of which further confirmed the reasonableness of Plaintiff's decision to terminate his contract with Defendants.

108.    In the latter half of Plaintiff's tenure in 2020, at Defendant Tidelands Health's Little River facility, Dr. Smaldone and Plaintiff divided patients unequally, with the lion's share of cases going to her group, due to Plaintiff's refusal to participate in the fraudulent schemes and, as a result, the revenue that he was costing Defendants.

109.    For example, as of April 16, 2020, there were 39 patients at the Little River facility, of which only 10 patients were assigned to Plaintiff, while the other 29 patients were assigned to Drs. Smaldone and Parish.

110.    As described above, Plaintiff increasingly experienced during his tenure

Defendants' attempts to circumvent his denials of IRF admissions due to his refusal to engage in the fraud set forth herein, including when Plaintiff rejected a patient for IRF, his decision and attesting paperwork denying IRF was mysteriously deleted (or scrubbed), and erased from history in Defendants' computer system, and then another physician would thereafter admit the patients for IRF, essentially circumventing and overriding the original denial.

111.    For example, on May 5, 2020, Plaintiff completed the PAS form for <u>Patient 10</u>, a Medicare beneficiary, and specifically checked "refuse" admission and then annotated the PAS, because the patient was not eligible for IRF admission under the Government Payor's criteria. However, the Plaintiff's comments in the PAS form and his refusal to admit this patient were subsequently deleted (or, "scrubbed") from the PAS.

112.    After Plaintiff's PAS comments and refusal to admit Patient 10 were deleted, a new PAS form was created the following day, May 6, 2020, and was submitted to Medical Director, Dr. Lisa Smaldone, who then approved Patient 10 for IRF admission on May 6 and the patient was thereafter admitted on or about May 8, 2020, despite Patient 10 being ineligible for IRF therapy per the Government Payor (Medicare) guidelines. Patient 10 was very upset upon admission, and even stated that he was "tricked" into coming to the hospital, and pushed hard to be discharged home as soon as possible.

113.    As a result of Defendants continuing to engage in the ongoing fraudulent conduct by admitting patients for IRF who did not qualify under Government Payor guidelines, and Plaintiff reaching the point that he could no longer work around the fraud, at the expense of patients and taxpayers, and also that his medical license was in jeopardy due to the ongoing fraud and due to Defendants again altering the medical records of Plaintiff's patients, such as by deleting Plaintiff's refusal to admit patients in order to nevertheless admit those patients despite the patient

not meeting the criteria for IRF admission pursuant to the criteria of Government Payors, among the other reasons set forth herein, Plaintiff was left with no choice but to terminate his services with Defendants on May 11, 2020.

114.    During Plaintiff's tenure with Defendants, Defendant Tidelands Health had a very high staff turnover, as much as 28.29% in January 2020, according to the CEO, Carey Swanson, which was due to Defendants' overall culture of emphasizing profits at the expense of patient care, and this culture also causes issues among the medical providers and the administration.

115.    For example, on September 8, 2019, Defendants' leadership, including CEO, Carey Swanson, received a letter from one of the nurses, Charge Nurse, Amanda (last name believed to be Goist), regarding numerous issues that a group of nurses was experiencing, such as the nursing staff being promised a patient load of five (5) to six (6) cases, but end up being assigned as many as eight (8) or more patients once they begin working at the IRF facilities. On several occasions, nurses complained that they were carrying nine (9) to ten (10) patients and feared that they cannot provide the care that their patients needed. After these concerns were raised to the CEO and leadership, however, they made light of the situation, dismissed the complaints, and the Charge Nurse, Amanda, who presented the letter to leadership on behalf of the nurses, was thereafter humiliated by management until she eventually resigned.

116.    In early 2020, Director of Business Development/Marketing, Jennifer Droppleman, was demoted to Admission Liaisons after she failed to meet Defendants' quotas for target IRF admissions, and she was thereafter replaced by Ashley O'Sullivan, who was transferred from another Defendant Encompass Health facility in Florence, South Carolina, in order "to fix the issues of low admissions" at the Tidelands Health facilities.

117.    In May 2020, one of Defendants' locums physicians, Dr. Scott Krupkin advised

Plaintiff that he shared similar experiences regarding Defendants admitting inappropriate patients when Dr. Krupkin worked at Defendants' facility in west Tennessee. Dr. Krupkin stated that he declined to admit a patient for IRF, who was presented to him by a Nurse Liaison, as the patient was a hospice candidate because of disseminated cancer. Dr. Krupkin attempted to convey his concerns to the CEO of the facility, but the same Nurse Liaison was already in the CEO's office. Dr. Krupkin told them that his role is to protect the facility from admitting inappropriate patients and prevent fraud, and that he cannot in good conscience admit a patient and, if that is their wish, he would rather leave. This confrontation resulted in Dr. Krupkin being effectively blacklisted from working again in another Encompass Health facility.

118.   Defendants have also retaliated against other employees for raising objections to the fraudulent conduct, including, on March 17, 2020, one of the physical therapists at the Little River facility, Liz (last name unknown), advised Plaintiff that she was fired and escorted out of the facility because she "was very vocal about the things that were not right or appropriate at the hospital."

119.   After Plaintiff terminated his services with Defendants on May 11, 2020, Defendants thereafter continued to retaliate against Plaintiff for his objections and refusal to participate in the fraudulent conduct during his tenure.

120.   On November 2, 2020, Plaintiff lost an assignment with the Midlands Regional Rehabilitation Hospital, much to his financial detriment, due to Defendants' refusal to respond to requests from the hospital for information to verify Plaintiff's tenure, and also due to the Medical Director, Dr. Smaldone, providing a negative reference for Plaintiff.

121.   As set forth above, Defendants harassed and discriminated against Plaintiff in the terms and conditions of his employment and contract because of lawful acts done by him and other

efforts to stop one or more violations of the False Claims Act, and/or due to Plaintiff's refusals to participate in the fraudulent conduct and his complaints about the fraudulent conduct, and Defendants' failure to correct it. In retaliation, Plaintiff was demoted and removed as the Associate Medical Director for a trumped-up reason on December 19, 2019, and was thereafter left with no choice but to terminate his services on May 11, 2020, at which time he was constructively discharged, and, additionally, Plaintiff also sustained post-employment retaliation, including due to Defendants providing a negative reference for Plaintiff and refusing to respond to a request for Plaintiff's tenure verification ultimately costing Plaintiff another work assignment after he stopped working for Defendants, all of which was to his financial detriment, emotional distress, humiliation, and embarrassment.

122.    As a result of Defendants' illegal conduct in violation of 31 U.S.C. § 3730(h), Plaintiff has sustained and will continue to sustain loss of income and benefits, both past and future, and Plaintiff has further suffered and will continue to suffer, emotional distress, humiliation, and embarrassment, damage to reputation and character, and Plaintiff is therefore entitled to the full relief under 31 U.S.C. § 3730(h).

123.    Defendants are responsible and liable for the conduct of its agents and employees pursuant to the applicable law and under the doctrine of respondent superior and under agency principles.

124.    This suit is timely filed.

**WHEREFORE**, the Plaintiff prays for judgement against the Defendants, and Plaintiff prays for the following relief:

1.    Compensatory damages, including back pay and front pay (or, in the alternative, reinstatement if the Court deems it appropriate);

2.      Two times the amount of backpay;

3.      Punitive damages;

4.      Prejudgment interest;

5.      Reasonable attorney's fees;

6.      Costs of this action;

7.      A jury to try this cause; and

8.      Appropriate injunctive relief ordering Defendants to cease and desist engaging in

fraudulent and retaliatory practices.

RESPECTFULLY SUBMITTED this the 23rd day of January, 2024.

**LAW OFFICE OF BILL NETTLES**

*/s/ William N. (Bill) Nettles*
William N. Nettles Fed. ID No.: 6586
Law Office of Bill Nettles
2008 Lincoln Street
Columbia, South Carolina 29201
Email: bill@billnettleslaw.com
Phone: (803) 814-2826

**THE BURKHALTER LAW FIRM, P.C.**

David A. Burkhalter, II, TN BPR #004771
D. Alexander Burkhalter, III, TN BPR #033642
Zachary J. Burkhalter, TN BPR #035956
*Admitted pro hac vice*
P.O. Box 2777
Knoxville, Tennessee 37901
(865) 524-4974

**COUNSEL FOR PLAINTIFF**